

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 67946-5-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| MICHAEL NOEL BENJAMIN, | ) | |
| | ) | |
| Appellant. | ) | FILED: July 29, 2013 |

SCHINDLER, J. — A jury convicted Michael Noel Benjamin of murder in the second

degree of Angela Pettifer. Benjamin argues insufficient evidence supports his

conviction. In the alternative, Benjamin claims he is entitled to a new trial because the

court erred in denying his motion to suppress the records the police obtained from

Safeway, the court abused its discretion in making several evidentiary rulings, and

prosecutorial misconduct during closing argument deprived him of a fair trial. We affirm

the conviction.

## FACTS

In the early summer of 2010, 36-year-old Angela Pettifer went to live with her

sister Cindy Hartzell in Monroe so that "she could stay sober." Cindy made sure that

Angela took an Antabuse pill each day.[1] While living with Cindy, Angela started dating

---

[1] We refer to several people by their first names for purposes of clarity and mean no disrespect by doing so.

Jason Chapman. Jason lived with his sister Amber Warren. Amber's house is located three or four miles from downtown Monroe.

In July, Angela started working at the Red Robin restaurant in Monroe and moved into a third floor apartment at the Savoy Building in downtown Monroe, apartment 303. The Savoy is an older mixed-use building located on Main Street. The first floor is occupied by businesses. The second floor is a mix of business offices and residential apartments. The third floor is entirely residential.

In early August, Angela told Cindy she wanted their father Thomas "Mike" Pettifer to come and stay with her. Mike Pettifer was a long-time alcoholic. Angela said that "she wanted to bring [Mike] out to see if she could help him get sober." Cindy refused to drive to Shoreline to pick up Mike. Cindy told Angela she "didn't think it was a good idea because [Angela] was just starting to, you know -- she wasn't drinking and [my father] was." Angela persuaded a friend to drive to Shoreline to get Mike. Mike arrived on Wednesday, August 11 and stayed in the spare bedroom of Angela's apartment.

When Cindy brought the Antabuse pill on Thursday morning, Angela "came downstairs to the car." When Cindy brought the Antabuse pill on Friday morning, she went upstairs to the apartment to make sure Angela took the pill. After she handed Angela the Antabuse pill, Cindy followed her into the bedroom to make sure she took it. Cindy said Jason was in Angela's bedroom smoking a cigarette near the window.

Cindy confronted Angela about whether she took the pill.

> Then I said: Did you just spit that pill out? And she said: No. I said:
> Well, you have white stuff around your mouth. She said: Oh, that's
> toothpaste. But I knew that it was probably the -- it was the pill probably.

Jason stayed at Angela's apartment on Friday, and they engaged in sex late Friday

2

night.

Cindy called Angela between 8:30 and 9:00 a.m. on Saturday, August 14 to tell her that she was coming over with the Antabuse pill. When Cindy arrived, Angela came down to the car and said that she could not take the pill because she drank alcohol the night before. Cindy got angry and told Angela she was "not going to be coming and bringing you these pills if you're not even going to be taking them." Cindy called Angela a half hour later and told her that she needed to send Mike home and break up with Jason.

> I just asked her what she was doing. And I told her that I think you need to send my dad home and break up with Jason. And she said: That's real nice, Cindy. And then she goes: I have to go to the store. I'll call you back later.

After talking to Angela, Cindy turned off her cell phone, "I didn't want to talk to her if she called because I was mad at her."

At approximately 10:15 a.m., Mike and Angela went to a nearby liquor store to buy alcohol. Jason got up later that morning and left at approximately 1:00 p.m. to go to the bank. Jason said that when he returned 30 or 45 minutes later, Angela had consumed "two bottles of Sutter Home [wine]. She seemed to be buzzed, intoxicated." Jason was surprised and asked her why she was drinking so early, and why she was not taking her Antabuse pill. Angela told Jason that "she didn't want to take it," and continued drinking.

Jason suggested they walk to a nearby park. Angela insisted on stopping at a bar on the way to the park and had a double shot of vodka. After leaving the bar, Jason said that Angela was "stumbling around pretty bad [and] being belligerent," and "[p]ull[ing] up her shirt to the cars passing by." Jason told Angela they needed to turn

3

around and go back to the apartment. "I was like, no, this is dumb, you're not going to be able to make it [to the park]. We have to cross a busy street right there, a lot of traffic."

On the way back to the apartment, Jason broke up with Angela. "I said I don't want to be with somebody that's this drunk all the time like this. . . . I just needed some time away." As soon as they got back, Angela went into her bedroom and "passed out." Mike defended Angela, telling Jason that she "has a problem and you should understand." Jason told Mike, "You're just as bad as she is. You have nothing to say about it." Jason called his sister Amber to come get him. Amber picked up Jason at approximately 4:00 p.m.

At 5:20 p.m., Angela called the Red Robin manager to tell him that she could not come to work that night. Angela and Mike then left the apartment to go to the nearby bars. Angela and Jason talked by cell phone and text message several times during the evening. Jason sent Angela a text message at 7:23 p.m. telling her that he loved her and "I hope you get your stuff straight and just take care of yourself tonight." Jason tried calling Angela at 10:38 that night but she did not answer.

Surveillance cameras show Angela and Mike stopping at a 7-Eleven at 8:06 p.m. and at a bank ATM[2] at 8:11 p.m. Angela is wearing a long-sleeved blue t-shirt, a pair of blue jeans, and a black belt. Mike is wearing a Hawaiian shirt and a straw cowboy hat.

At approximately 8:50 p.m., Savoy tenant Joseph "Mike" Brady saw Angela and Mike at the entrance of the Savoy trying to get into the front door. Brady did not recognize Angela or Mike and said they appeared to be "very inebriated." Brady said that when he left the building through the front door, Angela and Mike had "glazed eyes

---

[2] (Automated teller machine.)

4

and [were] looking straight ahead and didn't say a word to me or try to stop me or ask me anything about entering the building."

Mike said that after they were unable to get into the building, Angela told him "to stay put," and left. A surveillance camera shows Angela walking toward the Eagles Club at 8:53 p.m. Mike said that he waited for awhile and then went to several bars looking for Angela.

Kerry Prosser was watching a football game that night at the Eagles Club. His spouse Karla Prosser arrived at around 9:15 p.m. At 9:27 p.m., the Eagles Club bartender called 911 about a woman who was passed out and blocking the front doorway. The bartender then asked Karla to go check on the woman. Angela Pettifer sat up and talked to Karla. Karla said that it was apparent Angela had been drinking and was very upset. Angela told Karla "she wanted to go home" and pointed at the Savoy Building across the street. Karla asked her husband Kerry to walk with them to the Savoy.

The Savoy has exterior metal stairs located at the back of the building that access the three floors. The door at the entrance to each floor is locked but residents often propped the doors open for ventilation.

As the Prossers and Angela approached the metal exterior stairs, Kerry heard a man, later identified as Michael Benjamin, yelling to them that he was building security. Karla said that when they reached the third floor entrance, Benjamin opened the door. Benjamin is six feet, two inches tall and weighed approximately 210 pounds. Benjamin told them that he had "to check [Angela's] keys to make sure she lives here." Angela got her keys out and handed them to Benjamin. Benjamin used the keys to open the

exterior door and then handed the keys back to Angela. Karla testified:

> So [Benjamin] took [Angela's] keys and checked them and then gave them
> back and said, yes. Then I at one point said: Do you know who she is?
> And he said: I don't know the new tenants up on this floor.

Karla testified that when they arrived at the door of apartment 303, Angela "let herself in to her own apartment."

> We were talking still, me and Angela, a little bit. She was still upset. And I
> think [Benjamin] was talking more to my husband. I don't know exactly
> what they were saying. She went into the apartment. The door closed.

Karla said that Benjamin then walked away through the interior hallway. The Prossers walked down the exterior stairs and returned to the Eagles Club.

Kerry Prosser testified that after Benjamin used Angela's keys to open the exterior door, Benjamin said, "Well, I guess you live here. And upon that, he said: Well, which one do you live in?" Kerry said that Benjamin walked with them to Angela's apartment. Before leaving, Kerry asked Angela if she was okay. Before shutting the door, Angela told Kerry, "I'm fine, thank you." Kerry said Benjamin "went one way. We went out the way we came." The Prossers were at the Eagles Club when a police officer responded to the 911 call at 10:11 p.m.

Andrea Estep and Stephen Parchman lived in the apartment located next to Angela's apartment. Andrea and Stephen heard "a loud thump" come from the master bedroom of Angela's apartment between 12:00 and 12:30 a.m. Andrea Estep testified, in pertinent part:

> Q. Was the sound you heard louder than a door slamming?
> A. Yes. It sounded like something falling onto a floor like a bookcase
>    or something.
> Q. So something heavy?
> A. Yes.

Andrea Estep said that the pictures on the wall adjoining Angela's bedroom rattled. Andrea described the noise as "pretty intense. It shook our wall that connected to that apartment. Our pictures rattled. So it scared us. We usually don't hear things at that time at nighttime."

Mike took a cab from downtown Monroe and arrived home at approximately 2:20 a.m. Right after he arrived home, Mike called Angela but she did not answer.

The next morning, Mike tried to reach Angela without success. Mike called Cindy, but she did not answer because she still had her cell phone turned off. Mike called Joel Smith at approximately 9:00 a.m. Smith is a former boyfriend and the father of one of Angela's children. Mike asked Smith to drive to Monroe and check on Angela. Smith testified, in pertinent part:

A. Mike called. He asked me if I'd heard from Angela. He said he was out in Monroe drinking with her, and he was worried about her because he hadn't heard from her. I guess he couldn't get a hold of her. So, he wanted to know if I could drive to Monroe and see what was going on.
Q. Okay. Now, when you were talking to Mike, what was kind of the tenor of the conversation? Did he sound worried? Excited? Sad? Mad? Scared?
A. He sounded worried. He hadn't heard from her, so --
Q. Now, you've described for us a relatively -- I will use the term distant relationship with Mike. Did it surprise you when he called you on that Sunday morning?
A. A little bit. . . . But I was like, Mike doesn't drive so he can't check on her himself.

When Smith arrived at the Savoy, he called Angela on her cell phone so she could let him in the front door, but there was no answer. Smith walked to the back of the building. Smith said the exterior door to each floor was wedged open. Smith used the exterior metal stairs to get to the third floor. The door to Angela's apartment was unlocked. Smith testified that Angela normally left her door unlocked. When Smith

7

walked into the bedroom, he saw Angela "laying crossways across the bed, feet pointed towards the door. . . . She was naked." Smith called 911.

The police and emergency medical personnel responded to the 911 call. Monroe Police Department Sergeant Richard Dunn immediately noticed pieces of glass on the carpet outside the bedroom. There were a lot of glass shards in the bedroom, as well as large quantities of an orange colored liquid. The orange colored liquid had a pungent spicy odor that smelled like hot sauce.

Sergeant Dunn said that Angela's nude body was "on the bed, face up," a heavy foam mattress topper had been pushed up toward the headboard, and the bed was in disarray. Sergeant Dunn said that Angela's long-sleeved t-shirt and bra were pushed up above her breasts, and there was a band of discolored gray skin around her neck. The orange colored liquid was in Angela's hair, on her face, on her right arm, and on parts of the bedding and the wall. There was no orange colored liquid on her nude body. Angela's jeans were on the floor. The front of her jeans were stained with the orange liquid. There were glass shards on the bed, in Angela's hair, and under her body. Many of the glass shards contained the orange liquid.

Cindy turned on her cell phone after church. Mike talked to Cindy at approximately 1:15 p.m. Mike told Cindy that he got separated from Angela the night before, that he called Smith to check on her, but he had not heard back from Smith. Cindy called Jason. Jason said he had been trying to reach Angela but she had not responded. Cindy was on her way to check on Angela when Smith called and told her that Angela was dead. Cindy gave the police a tape-recorded statement and access to Angela's cell phone records.

8

Detective Barry Hatch initially focused on Mike Pettifer and Jason Chapman. Detective Hatch testified that it is "common protocol to take a look at the boyfriend[,] especially when he was one of the last people with the victim." Detective Hatch asked Cindy to make arrangements to transport her father to Monroe for questioning.

At approximately 5:30 p.m., Detective Hatch and Sergeant Dunn drove to Amber's house to interview Jason. When Amber told Jason that Angela was dead, Detective Hatch said that "[h]e was pretty distraught. You could see his eyes starting to tear up immediately. I believe he had a phone in his hand. He kind of had that look of I don't know what to do."

Jason agreed to give the police a tape-recorded interview. Detective Hatch said that "[n]early right after [Jason] sat down, he agreed to help in any way he could." Jason told the detectives that he last talked to Angela at around 8:00 p.m. on August 14. He said that he tried to call her again around 10:00 p.m. but did not reach her. Jason told Detective Hatch that he called and sent text messages to Angela on Sunday morning. Jason said that he also called Cindy and left her a voicemail. Jason gave Detective Hatch access to his cell phone records.

The officers did not observe any injuries to Jason's face or hands, or orange liquid stains. But Detective Hatch asked Jason about a powdery orange stain on his pants. Jason said the orange stain on his pants was from eating "Cheetos." Detective Hatch said the substance looked like Cheetos but took a sample of the powdery orange substance and a photograph of Jason's pants.

Amber Warren told Detective Hatch that Jason does not drive and she picked up Jason the day before in the late afternoon. Amber told the Detective that Jason was

9

home all night. Detective Hatch described Amber's home as "a pretty small house, fairly tight confined area." Amber testified that her bedroom is across the hallway from Jason's bedroom.

Amber said Jason did not leave the house and she did not hear her border collie barking. Amber said that her border collie "runs up and d[o]wn the fence line barking" when people, including family members, arrive or leave the house. "As soon as they leave the gate, she's nipping at them."

Detective Sergeant Cindy Chessie interviewed Mike Pettifer after he arrived later that day. Mike wore the same clothes he had on the night before. Detective Chessie did not observe any orange stains on Mike's clothing. Mike explained that the scrape on his chin and elbow were the result of a fall.

Detective Chessie testified that Mike smelled like alcohol but "wasn't slurring like somebody who was intoxicated would slur, but he spoke very slowly and labored." Detective Chessie said Mike "walked slow[,] talked slow," and "seemed pretty feeble." Detective Chessie said that Mike had difficulty recounting events, and "was confused about the two nights because he was there Friday and Saturday night. So he kind of crossed over and was confused."

> [Mike] was very slow. He walked slow. He talked slow. He seemed very confused. I had a hard time keeping him on task. Even to tell him to walk into our interview room was like, no, come on, this way. He seemed pretty feeble. He's not that old of a man, but he was very -- he appeared very old and not together.

Snohomish County Medical Examiner Dr. Norman Thiersch conducted the autopsy, took photographs, and collected evidence for forensic testing. Dr. Thiersch said that there were small fragments of glass and an orange liquid in Angela's hair that

was consistent with hot sauce. Angela had an abrasion on the right side of her nose and on her chin, and bruises on her fingers, knuckles, and right wrist. Dr. Thiersch said the bruises on Angela's right hand could be consistent with defensive injuries. Dr. Thiersch said that Angela suffered significant bleeding and blunt force trauma from being struck on the head. Dr. Thiersch also testified that the blunt force trauma to her head could have been caused by an object like a bottle of hot sauce.

Dr. Thiersch said the injuries to Angela's throat and the petechial hemorrhages in her eyes were consistent with strangulation. Angela's neck was bruised, there were internal injuries to her throat, and the hyoid bones in her neck were broken. Dr. Thiersch concluded Angela died from strangulation, either manually or with some type of ligature, and that her death was a homicide. Dr. Thiersch testified the injuries to her throat were caused by the use of a significant amount of pressure for a minimum of four to five minutes, or longer if the victim was fighting and struggling. Dr. Thiersch testified that with a blood alcohol level of .28 mg/100 ml, Angela Pettifer was "significantly impaired by alcohol" when she was killed.[3]

Dr. Thiersch testified that he did not find evidence of sexual assault, but that did not mean lack of penetration.

Q. The fact that you didn't see any obvious injury to Ms. Pettifer's
vaginal area, does that tell you that she was not penetrated?
A. No, it does not.
Q. Is it known -- is it possible for an adult female who is sexually active
to be penetrated and leave no injury?
A. Yes, it is.
Q. So essentially what these findings are, it's a lack of either
spermatozoa or obvious injuries?
A. That is correct.

---

[3] Under RCW 46.61.502(1)(a), the blood alcohol limit is .08 mg/100 ml.

The police interviewed the tenants at the Savoy and collected DNA[4] samples from all of the male residents and business owners. Benjamin lives on the second floor in a small business office with a bathroom, unit 211. There was a sign with a telephone number posted outside the door for "Remodeling and Handyman Services." When Sergeant Dunn contacted Benjamin on Monday, August 16, Benjamin "declined to answer just a couple questions" and said he was "too tired" to look at photographs. On Tuesday, August 17, Sergeant Dunn called the telephone number listed on the sign and left Benjamin a message asking him to call to schedule an interview. An attorney returned the call 10 minutes later and said he would "have Michael Benjamin call to answer the questions."

Lauren Chapman told the police that she saw Benjamin coming down the exterior metal stairs from the third floor at approximately 12:00 a.m. Chapman said that Benjamin was "sweating profusely" and told her either, " 'Well, it's awful hot night to have sex' or 'Awful hot weather for having sex.' "

On August 18, the police interviewed Benjamin at his attorney's office. Benjamin agreed to give a tape-recorded statement. Benjamin told the police that he was on the second floor exterior staircase when he saw what he thought was a fight at the Eagles Club. Benjamin initially said he did not know or recognize Angela Pettifer from the photograph, but later said that the person in the photograph may have been the woman he assisted that night. Benjamin described how he opened the door to Angela Pettifer's apartment. Contrary to the statements from the Prossers, Benjamin told the police that he had Angela's keys and used the keys to open the apartment door. Benjamin then

---

[4] (Deoxyribonucleic acid.)

demonstrated how he "dropped [Angela's] keys into the apartment with his feet at the threshold and stated he was never in the apartment while Angela lived there."

After the interview, the police went to the second floor staircase landing where Benjamin said he saw a fight at the Eagles Club. The second floor stair landing is approximately 47 yards from the Eagles Club. A six-foot tall detective stood at the same vantage point that Benjamin described. The detective said that "in order to see at least fifty-percent of a patron he or she would need to be either thirteen feet west of the front door, towards the street, or eleven feet south of the front door along the sidewalk."

The police believed that the glass shards and spicy orange liquid in Angela's apartment were from a broken bottle of hot sauce, but they did not know which brand because the portion of the broken bottle with the label and cap was not in the apartment. The only hot sauce the officers found in the apartment, McIlhenny Co. Tabasco Brand Pepper Sauce, did not match the orange liquid found in the bedroom. The police purchased at least four other brands of hot sauce to compare to the orange liquid and tried "to mimic both visually and by smell [to] ascertain or at least get closer to what type of hot sauce that was." None of the samples matched the spicy orange liquid found in the apartment and on Angela.

On August 25, the court issued a warrant to search Benjamin's apartment. The police executed the search warrant on August 26. During the search, Detective Hatch noticed a two-thirds-empty 23-ounce bottle of Frank's Redhot Original Cayenne Pepper Sauce (Frank's Hot Sauce). Detective Hatch said that "[w]hat originally caught my attention was the same series of dimples, if you will, the same three rows of dimples that I have seen on the same glass from the death scene." The police took photographs

of the apartment and the bottle of Frank's Hot Sauce. The police also seized a blue shirt with a bleach stain.

Using Benjamin's telephone number, Sergeant Dunn went to the Safeway in Monroe and confirmed that Benjamin had a Safeway Club Card. Detective Hatch contacted Safeway Loss Prevention and learned that Benjamin purchased a bottle of Frank's Hot Sauce on August 11. On August 30, a judge authorized the issuance of a search warrant to obtain records from the Safeway in Monroe for Benjamin's purchase of Frank's Hot Sauce on August 11, as well as all of his other Club Card transactions. The Safeway records showed that Benjamin purchased a 23-ounce bottle of Frank's Hot Sauce on June 6, July 17, and August 11, 2010. The records also showed that he purchased a bottle of bleach at 7:36 a.m. on August 15.

The Washington State Patrol Crime Laboratory (WSPCL) conducted DNA testing on the forensic evidence. DNA from Mike Pettifer was found on Angela's long-sleeved shirt. DNA from Jason Chapman was found on Angela's left breast, and on her jeans and belt. DNA from Benjamin was found on both of Angela's breasts.

The State charged Benjamin with murder in the second degree of Angela Pettifer. Benjamin filed a motion to suppress the records obtained from Safeway. The court denied the motion to suppress.

The defense theory at trial was that either Mike Pettifer or Jason Chapman murdered Angela. During the seven-day jury trial, the State called approximately 25 witnesses, including the police Detectives, the medical examiner, Angela's sister Cindy Hartzell, Mike Pettifer, Jason Chapman, Amber Warren, Karla and Kerry Prosser, the Savoy Building manager, Savoy residents, and WSPCL forensic scientists. The court

admitted into evidence approximately 300 exhibits, including photographs of Angela and the apartment, photographs of Benjamin's apartment, photographs of the orange powdery substance on Jason Chapman's pants, and the cell phone records for Angela, Mike, and Jason. The court also admitted into evidence two tape-recorded police interviews of Benjamin. Without objection, the State played to the jury the tape-recorded interviews on August 18 and August 26.

Karla Prosser testified that Benjamin said he was building security and insisted on verifying that Angela's keys opened the exterior door. Karla said that after using Angela's keys to open the exterior door, Benjamin returned the keys to Angela. Karla testified that when they reached the apartment, Angela, not Benjamin, had her keys.

> It [w]ent very quick. [Angela] basically went to the door, was still saying things about how bad she felt about her behavior, said thank you. She at that point already had her keys. That went pretty quick. She didn't have to fumble. Pretty much went right in. She went in.

Karla testified that Angela "definitely . . . put the keys in the lock and unlocked the [apartment] door." Karla testified that throughout the encounter, Benjamin did not touch Angela. "He just took the keys [at the exterior door to the third floor]. But he did not touch her." Karla also testified that it was a hot night but no one was "pouring sweat."

Kerry Prosser testified that Benjamin told them that he was "in charge of making sure people don't come in that don't live here." Kerry said that they were on the exterior third floor entrance with Benjamin for a minute or less. Kerry testified that Benjamin did not touch Angela at any point.

Savoy Building manager Jerome Keating said that Benjamin rented a small business suite with a bathroom on the second floor. Keating testified that Benjamin was not a Savoy employee or "any kind of a night watchman," and had no responsibility for

security. Keating testified that the laundry facilities are located on the second floor of the building and there are no common areas, including bathroom or laundry facilities, on the third floor.

Lauren Chapman testified that she and her family live on the second floor of the Savoy and she was doing laundry the night of August 14. Chapman said that while watching an hour-long television show, she folded the last load at about 11:30 or 11:40 p.m. Chapman said that she went to the second floor landing of the exterior metal staircase to smoke a cigarette between 12:00 and 12:30 a.m. Chapman testified that while smoking the cigarette, she heard footsteps coming down the stairs from the third floor "going a bit fast." Chapman said that the first thing she noticed was that Benjamin was "really, really sweaty. . . . Dripping sweat; like sweating extremely profusely. . . . [A]n unusual amount of sweat for the heat at that time." Chapman testified that as Benjamin started to enter through the propped open exterior door on the second floor, "he kind of saw me out of the corner of his eye and stopped to talk to me." Chapman said, "It's a really, really hot night out." Chapman testified that in response, Benjamin said, "It's a hot night for having sex. Something really along those lines. I don't remember the exact wording." Chapman said that Benjamin's comment "creeped [her] out," making her feel "exposed." "My reaction was to put my cigarette [out] early and go in the house and shut all the doors behind me."

Mike Pettifer testified that in 2010, he drank every day and alcoholism impaired his memory. Mike said he had no memory of going to the store to buy liquor with Angela in the morning on Saturday, August 14. Mike testified that the last time he saw his daughter was that night when she left him at the front door of the Savoy after trying

16

unsuccessfully to get in. Mike said that after Angela left, he waited for some time before going to look for her at a few bars in downtown Monroe. Mike testified that he borrowed a cell phone to call a cab to take him home to Shoreline, and waited 45 minutes for the cab. The cab driver testified that he picked up Mike at 1:30 a.m. in downtown Monroe and dropped him off at his home in Shoreline at 2:20 a.m.

Detective Hatch testified that Mike Pettifer's inability to remember what happened made it difficult to determine his whereabouts. Nonetheless, Detective Hatch said that he was able to verify that the bartender at the Chopping Block Tavern saw Mike Pettifer later that evening.

Detective Hatch testified that Angela's body appeared to be staged in a sexual manner. The photographs show Angela's nude body lying crosswise on the bed with her feet pointing toward the door. The heavy mattress topper is shoved up toward the headboard, Angela's arms are extended out to her sides, and her shirt and bra are pushed up over her bare breasts. Detective Hatch testified that the police never found the keys to Angela's apartment.

Detective Hatch testified about finding the nearly empty 23-ounce bottle of Frank's Hot Sauce in Benjamin's apartment, and noticing that the distinct ridges of the bottle matched the pieces of glass found in Angela's bedroom. Detective Hatch testified about the unique expiration stamp on the bottle of Frank's Hot Sauce and that Benjamin purchased the hot sauce at the Safeway in Monroe. The State introduced into evidence the records from Safeway showing that Benjamin purchased Frank's Hot Sauce on June 6, July 17, and August 11, 2010.

Detective Hatch also testified that after seizing the bottle of Frank's Hot Sauce from Benjamin's apartment, a detective accidentally dropped the bottle on the ground. Detective Hatch said that while the neck of the bottle remained intact, the rest of the bottle shattered into pieces that looked like the shards of glass found at the crime scene. Detective Hatch also testified that the odor was "the same" as the odor of the hot sauce in Angela's apartment. Detective Hatch testified, in pertinent part:

> I separated the items by small pieces and large pieces. The large pieces included the cap, the neck, a little bit of the side and then the decal that had the logo and all of that and the contents of the container, sort of was still rather sticky and still held together a lot of the larger pieces that it was still connected to.
>
> Q. The odor that was emanating from this broken bottle and its contents, how did that compare to the odor that was in Angela Pettifer's bedroom in 303?
>
> A. It took m[e] right back there. It was the same. . . . Of note, there were several large pieces that still -- from the bottom or the foot of the container -- that thicker portion that has that curved radius came out together. And the neck from about the start of the curve up all stayed intact along with the cap.
>
> Q. Now, these larger pieces to include the label, is this precisely the portion of the bottle that was missing from Angela Pettifer's bedroom?
>
> A. Very, very close.

Detective Hatch testified that by removing the neck of the bottle with the cap and the label, "the killer had done at least some clean up at Angela's apartment."

> The largest pieces, in other words, the neck which contained the cap and those items that would have been sort of still stuck together with the label, all went together. In other words, if somebody just had two hands and picked up two items, the label and the neck, you would take the bulk of the glass.

Cindy Hartzell often went food shopping with Angela and testified that while Angela sometimes purchased Tabasco sauce, Angela did not buy Frank's Hot Sauce.

The State introduced the cell phone records of Angela, Jason Chapman, and Mike Pettifer. At 4:39 p.m. on Saturday, August 14, Jason sent a text message to Angela saying he hoped she made it to work and did not get fired. Over the next three hours, Angela talked to Jason on the phone five times. At 7:23 p.m., Jason sent a text message to Angela saying, "I do love and care about you. I hope you get your stuff straight and just take care of yourself tonight." At 8:38 p.m., Jason sent Angela a text message saying, "What you doing?" The last time Jason called Angela was at 10:38 p.m. Angela did not answer.

At 10:02 a.m. on August 15, Jason sent a text to Angela saying, "Hope you had a nice night." Jason called Angela four times and continued sending her text messages, such as: "So what's up. You not talking to me now or what?" At 4:28 p.m., Jason sent another text message to Angela saying, "Wish you'd at least let me know that you're okay. I'm really getting worried."

The State and the defense entered into a number of stipulations at trial. The parties stipulated that the temperature on August 14 and 15 ranged from a high of approximately 91 degrees Fahrenheit to an overnight low of 65 degrees. The parties stipulated that the evidence established Benjamin purchased 23-ounce bottles of Frank's Hot Sauce at the Monroe Safeway on June 6, July 17, and August 11, 2010; that the glass fragments found at the crime scene were from a 23-ounce bottle of Frank's Hot Sauce; and that it was "very likely" that the glass fragments in the victim's apartment came from a 23-ounce bottle of Frank's Hot Sauce.

WSPCL forensic scientist Mariah Low extracted DNA from the evidence. WSPCL forensic scientist Lorraine Heath conducted DNA "Y-STR"[5] testing on the DNA extracts and the reference samples for Jason Chapman, Mike Pettifer, and Benjamin. Heath testified that she used Y-STR testing because the amount of female DNA was significantly greater, and the actual amount of extracted male DNA was low. Y-STR testing is a much more sensitive analysis that can be used with less DNA to identify the male Y-chromosome.

Heath testified that she found a partial profile on Angela's right breast that matched Benjamin. Heath said that the DNA evidence on Angela's right breast would not occur "more frequently than one in five men in the U.S. population." Heath testified that the DNA from Benjamin that was found on the right breast was "weak evidence."[6]

Heath testified that she identified the DNA of two different males on Angela's left breast. After comparing the known samples from Jason Chapman and Benjamin, Heath concluded the profile of both men matched the DNA found on Angela's left breast.

> Q. Once you received that known sample from Jason Chapman, did that change your ability to identify who may have been the minor component of the breast -- or the minor component of the DNA profile that was found in the mixture on Angela's left breast?
> A. Yes. Typically it's not uncommon in cases of sexual assault either where the victim is either alive or dead that there's a consensual sex partner and that we receive information that there was some sort of consensual sexual activity prior to whatever assault occurred. Typically if we have that information, we will request a reference sample from the consensual sex partner so that we can

---

[5] (Short tandem repeat testing with the male Y-chromosome.)

[6] Heath testified:

It's pretty weak evidence. It's still good for exclusions. But of the 20 men in here, there's probably four of you that I would not be able to exclude from the right breast swab, which, as I'm sure those of you that are men in this room, you're obviously probably pretty certain that you weren't touching her right breast. So, it just -- it is what it is. He -- Michael Benjamin does match that profile, but so would approximately one in five other men. So it's weak evidence.

> essentially subtract that profile out. That would be expected to be present based on whatever activity occurred. So, it's something that we can subtract to see what's left.
>
> So when I was able to compare Jason Chapman's reference sample to the profile I'd previously obtained from that left breast swab, I was able to determine that he was, in fact, the major contributor or that he matched the major contributor that I had labeled individual A in my previous report.
>
> So once I was able to say that and I was able to assume that his DNA was on this breast. Then I was -- having subtracted that out, what I was left with was the second contributor, and that matched Michael Benjamin.

Heath testified that the DNA evidence indentifying the DNA profile for Benjamin on Angela's left breast "would not . . . occur more frequently than one in 1300 male individuals in the U.S. population." Heath testified that the Y-STR match to Benjamin was "quite strong."

> So for Y-STR testing, this is actually quite a strong statistic. I believe the very best we can get is one in 2800. So this is quite strong from a Y-STR perspective. . . . This statistic is also very conservative. Y-STR testing and the statistics generated from it is very limited by the size of the database that we're comparing it to. Now, this database is getting bigger all the time. And so the statistics will get stronger and stronger as time goes on. But at the moment, this number is adjusted for the fact that the database is still relatively small.
>
> So, it's a very conservative number. So when I say it's not expected to occur more frequently than one in 1300, it's probably much rarer than that, but that's our conservative estimate.

Heath testified that the DNA on Angela's left breast was the result of direct touching, and not secondary or indirect contact.

Heath testified that the DNA from Angela's fingernails matched Jason Chapman and Mike Pettifer. But Heath said that DNA evidence found in fingernails typically includes "men that she either has an intimate relationship with or just cohabits," and is consequently "hit-and-miss."

The jury found Benjamin guilty of murder in the second degree of Angela Pettifer.

ANALYSIS

Benjamin contends insufficient evidence supports his conviction for murder in the second degree of Angela Pettifer. In the alternative, Benjamin argues he is entitled to a new trial because (1) the court erred in denying his motion to suppress the records the police obtained from Safeway, (2) the court abused its discretion in several rulings on the admissibility of evidence, (3) the prosecutor committed misconduct during close argument, and (4) cumulative error.

Sufficiency of the Evidence

In determining whether sufficient evidence supports the conviction, we must view the evidence in the light most favorable to the State to determine whether any rational trier of fact could have found elements of the crime beyond a reasonable doubt. State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). When challenging the sufficiency of the evidence, the defendant admits the truth of the State's evidence, and all reasonable inferences must be drawn in favor of the State and interpreted strongly against the defendant. Salinas, 119 Wn.2d at 201. We give deference to the finder of fact in resolving conflicting testimony and weighing the evidence. State v. Thomas, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004). Circumstantial and direct evidence are accorded equal weight. State v. Delmarter, 94 Wn.2d 634, 638, 618 P.2d 99 (1980).

Viewing the evidence in the light most favorable to the State, the jury could find beyond a reasonable doubt that Benjamin committed the murder of Angela Pettifer. Benjamin lived on the second floor of the Savoy. There are no common areas or facilities on the third floor. Benjamin is six feet, two inches tall and weighs approximately 210 pounds. There is no dispute that Benjamin did not know Angela but

22

watched as Karla and Kerry Prosser walked with an obviously inebriated young woman to the Savoy the night of August 14. Benjamin had no responsibility for security at the Savoy. Nonetheless, Benjamin told the Prossers that he was responsible for security and insisted Angela give him her keys to open the third floor exterior door before allowing them to go to Angela's apartment

There is no dispute that Benjamin accompanied Angela and the Prossers to Angela's apartment on the third floor. Contrary to Benjamin's statements to the police, Karla and Kerry Prosser testified that Angela let herself into the apartment. The evidence established that Angela routinely left her door unlocked.

Viewing the evidence in the light most favorable to the State, the jury could find that after hitting Angela over the head with a 23-ounce bottle of Frank's Hot Sauce, Benjamin then strangled her to death, shoved her shirt and bra over her breasts, and posed her in a sexual manner.

Benjamin stipulated that he purchased a 23-ounce bottle of Frank's Hot Sauce on June 6, July 17, and again on August 11, 2010. But on August 26, the police found only one nearly empty bottle of Frank's Hot Sauce in Benjamin's apartment.

Angela's bedroom contained copious amounts of hot sauce and glass shards from a broken 23-ounce bottle of Frank's Hot Sauce. Angela's hair contained hot sauce and shards of glass from the broken bottle. There was hot sauce on her long-sleeve shirt and jeans but not on her nude body.

Angela's body was posed in a sexual manner face up, nude from the waist down with her arms splayed to the side, palms facing up, with her long-sleeved shirt and bra pushed up over her breasts.

Between 12:00 and 12:30 a.m., the couple that lived next door heard an unusual and loud thump from the master bedroom of Angela's apartment. The force rattled the pictures and shook the adjoining wall to the master bedroom. Between 12:00 and 12:30 a.m., Lauren Chapman saw Benjamin rushing down the exterior third floor stairs to the second floor landing. Lauren Chapman said Benjamin was sweating profusely and dripping with sweat, in an amount excessive for the temperature that night.

Medical examiner Dr. Thiersch testified that Angela suffered significant blunt force trauma from the blow to her head but died from strangulation. Dr. Thiersch said it would have taken at least four to five minutes to strangle Angela to death, and the killer had to use a significant amount of pressure to fracture the cartilage in her neck.

Benjamin's DNA was found on both of Angela's breasts. Strong evidence established that the DNA on Angela's left breast matched Benjamin's DNA profile and was left by touching her breast.

We conclude sufficient evidence supports the jury conviction of Benjamin for the murder of Angela Pettifer.

Search Warrant

Benjamin argues the court erred in denying his motion to suppress the Safeway records of his purchase history. Benjamin contends the search warrant violated article I, section 7 of the Washington State Constitution and the Fourth Amendment. The State contends the court did not err in ruling that there was probable cause to obtain the records for Benjamin's purchases of Frank's Hot Sauce.

The Fourth Amendment of the United States Constitution prohibits unreasonable searches and seizures. State v. Williams, 102 Wn.2d 733, 736, 689 P.2d 1065 (1984). Article I, section 7 prohibits government intrusion upon private affairs without authority of law. WASH. CONST. art. 1, § 7. For a warrant to be valid under both the Fourth Amendment and article 1, section 7, it must be supported by probable cause and particularly describe the place to be searched and the items to be seized. State v. Vickers, 148 Wn.2d 91, 108, 59 P.3d 58 (2002); State v. Griffith, 129 Wn. App. 482, 488, 120 P.3d 610 (2005).

The search warrant required Safeway to provide, in pertinent part:

> Records related to the purchase of "Frank's RedHot Cayenne Pepper Sauce" from a transaction on August 11, 2010 at 07:33 hours at store number 537, register number 3, transaction number 0142. To include all club card history under the name of Michael Benjamin and referencing telephone number 253-709-8035, as well as any related surveillance video of said transaction.

Detective Hatch submitted a detailed 11-page affidavit in support of the request to issue a search warrant to Safeway. The affidavit describes the murder and the copious amounts of hot sauce and broken shards of glass found in Angela's apartment. The affidavit also describes the interviews with Karla and Kerry Prosser and Lauren Chapman, the interviews with Benjamin, and as authorized by a previous search warrant, the seizure of a 23-ounce bottle of Frank's Hot Sauce from Benjamin's apartment. The affidavit describes in detail how the pattern of dimples on the bottom of the bottle of Frank's Hot Sauce is similar to the pattern on the bottom of the bottle shards found in Angela's apartment. The affidavit also describes the unique expiration date stamp on the bottle, and how the police were able to determine that only Safeway carried 23-ounce bottles of Frank's Hot Sauce with the same expiration date stamp.

On page nine of the affidavit, Detective Hatch states that by using Benjamin's listed phone number, Sergeant Dunn was able to confirm that Benjamin was a Club Card member at the Safeway in Monroe. Detective Hatch states that he contacted Safeway Loss Prevention and learned that Benjamin purchased a 23-ounce bottle of Frank's Hot Sauce on August 11, 2010.[7]

Safeway produced records showing Benjamin's Frank's Hot Sauce purchases. Safeway also produced records for all of Benjamin's purchases, including the purchase of bleach at 7:36 a.m. on August 15.

The defense filed a motion to suppress the records obtained from Safeway. In particular, the defense sought to exclude "his complete grocery purchases at the Monroe Safeway from May, 2010 to September, 2010." Benjamin argued the police unlawfully obtained information that he had a Safeway Club Card. The defense asserted the request to obtain the records for all of Benjamin's transactions at Safeway was overbroad. The defense argued the information the police obtained by using his telephone number violated his right to privacy under the Fourth Amendment and article I, section 7 of the Washington constitution. Benjamin also argued that because the warrant was overbroad, the court should exclude evidence of all purchases from Safeway.

---

[7] At page nine, the affidavit states, in pertinent part:

Your Affiant provided the name of Michael Benjamin and Benjamin's telephone numbers 253-709-8035 and 425-295-5777 to Loss Prevention. It was verbally confirmed from Ingrid Bechtel, Safeway loss prevention, that Michael Benjamin purchased Frank's RedHot Original Cayenne Pepper Sauce on August 11, 2010, at 07:33 hours at store number 537, register number three, transaction number 0142. Bechtel knew this due to provided name and telephone number by your Affiant. It was also stated to your Affiant that surveillance footage and "club card" information for the provided telephone numbers existed.

Sergeant Dunn also completed a transaction at Safeway of Monroe and when prompted, insert[ed] Michael Benjamin's listed telephone number of 253-709-8035. The receipt provided indicated the club card holder to be that of Michael Benjamin.

Below, the State conceded that the information the police obtained from Safeway Loss Prevention was improper, but argued the affidavit "contains facts independent of the unlawfully obtained information sufficient to support a probable cause determination," and that without regard to the inclusion of the improper information, there was probable cause to issue the search warrant.

The trial court denied the motion to suppress. The court ruled that without regard to the information in the two paragraphs on page nine confirming that Benjamin had a Safeway Club Card by using Benjamin's telephone number and contacting Safeway Loss Prevention, "looking at the balance of the warrant, there is ample probable cause to support the issuance." We agree with the trial court.

"A search warrant may issue only upon a determination of probable cause." State v. Thein, 138 Wn.2d 133, 140, 977 P.2d 582 (1999). "Probable cause exists if the affidavit in support of the warrant sets forth facts and circumstances sufficient to establish a reasonable inference that the defendant is probably involved in criminal activity and that evidence of the crime can be found at the place to be searched." Thein, 138 Wn.2d at 140. "Search warrants are to be tested and interpreted in a commonsense, practical manner, rather than in a hypertechnical sense." State v. Perrone, 119 Wn.2d 538, 549, 834 P.2d 611 (1992). "[P]robable cause requires a nexus between criminal activity and the item to be seized." Thein, 138 Wn.2d at 140.[8]

"[T]he inclusion of illegally obtained information in a warrant affidavit does not render the warrant per se invalid, provided that the affidavit contains facts independent

---

[8] (Internal quotation marks and citation omitted.)

of the illegally obtained information sufficient to give rise to probable cause." State v. Gaines, 154 Wn.2d 711, 718, 116 P.3d 993 (2005). Under the severability doctrine, the "infirmity of part of a warrant requires the suppression of evidence seized pursuant to that part of the warrant but does not require suppression of anything seized pursuant to valid parts of the warrant." State v. Temple, 170 Wn. App. 156, 163, 285 P.3d 149 (2012).[9]

Here, there was a nexus between the 23-ounce bottle of Frank's Hot Sauce that was used to murder Angela and the Safeway records of Benjamin's purchases of Frank's Hot Sauce. The valid parts of the warrant describing the murder, the murder investigation, and the 23-ounce bottle of Frank's Hot Sauce found in Benjamin's apartment were significant when compared to the warrant as a whole. The primary purpose of the request for a search warrant was to obtain records for Benjamin's purchases of Frank's Hot Sauce. In response, Safeway provided a separate record of his purchases of Frank's Hot Sauce.

Benjamin also asserts the request in the search warrant for all transactions was overbroad and the evidence that he purchased bleach in the early morning of August 15 should have been suppressed. The State concedes that the request to obtain records related to all of Benjamin's purchases was overbroad and should have been suppressed, but argues the evidence was harmless. We accept the State's concession.

The State bears the burden of proving that the error was harmless beyond a reasonable doubt. State v. Guloy, 104 Wn.2d 412, 425, 705 P.2d 1182 (1985). The

---

[9] (Internal quotation marks and citation omitted.)

court must determine whether the "untainted evidence is so overwhelming that it necessarily leads to a finding of guilt." Guloy, 104 Wn.2d at 426. In addition to the testimony at trial, the statements Benjamin made to the police, the murder scene, and the forensic evidence, the State points out that the police found a bottle of bleach and a bleach-stained shirt in Benjamin's apartment during the execution of the search warrant on August 26. Benjamin does not challenge the search of his apartment. The State also points out that without objection, Detective Hatch testified that bleach is often used to destroy evidence. Because the untainted evidence leads to a finding of guilt, we conclude that the admission of the evidence that Benjamin purchased bleach the morning of August 15 was harmless.[10]

Evidentiary Rulings

The admissibility of evidence is within the discretion of the trial court. State v. Atsbeha, 142 Wn.2d 904, 913-14, 16 P.3d 626 (2001). A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds or untenable reasons. State v. Finch, 137 Wn.2d 792, 810, 975 P.2d 967 (1999). An abuse of discretion occurs only when no reasonable person would take the view adopted by the trial court. Atsbeha, 142 Wn.2d at 913-14. An evidentiary error that does not result in prejudice to the defendant is not grounds for reversal. State v. Bourgeois, 133 Wn.2d 389, 403, 945 P.2d 1120 (1997). An error is not prejudicial unless, within reasonable probability, the error materially affected the outcome of the trial. Bourgeois, 133 Wn.2d at 403.

---

[10] Accordingly, we also conclude that the testimony that Benjamin purchased bleach the morning of August 15 did not materially affect the outcome of the trial.

29

For the first time on appeal, Benjamin argues the court erred in allowing

Detective Hatch to testify that bleach is often used to destroy evidence. Because

Benjamin did not object below, the issue is not preserved for appeal. See State v.

Kirkman, 159 Wn.2d 918, 926, 155 P.3d 125 (2007).

Benjamin also argues the court abused its discretion by allowing Lauren

Chapman to testify that Benjamin told her it was "a hot night for having sex." Benjamin

contends unfair prejudice outweighed the probative value of the statement. The trial

court rejected Benjamin's argument, ruling, in pertinent part:

> [T]he Court does conclude that it is probative and that its probative nature
> does outweigh any unfair prejudice. . . . [C]oming in the context of this
> case where the victim's body is ultimately found in the way that it is and
> that the crime allegedly does appear to have some type of sexual
> component to it, but the fact that the defendant allegedly made a
> statement to this effect shortly after presumably the time of the alleged
> incident does appear to have probative value.

The trial court properly weighed the probative value of the testimony and the prejudicial

effect. The court did not abuse its discretion in ruling that the probative value

outweighed prejudice.

Benjamin also challenges the exclusion of a statement Angela allegedly made to

her sister a week before her death. Benjamin contends the alleged statement was

admissible to prove motive.[11] Evidence of prior threats is admissible to show motive.

State v. Powell, 126 Wn.2d 244, 260, 893 P.2d 615 (1995).

According to Cindy, Angela said Jason Chapman told Angela that if she were

with another man, "he would chop her up with a hatchet." Cindy never asked Jason

about the alleged statement, and Jason unequivocally denied making the alleged

---

[11] The record does not support the State's assertion that Benjamin did not make this argument below.

statement to Angela. Cindy also admitted that Angela "was not . . . afraid of Mr. Chapman."

The court granted the State's motion to exclude the statement that Cindy said Jason allegedly made to Angela. But the court allowed Benjamin to ask Jason about the statement on cross-examination. The court ruled, in pertinent part:

> I agree with [the prosecutor] to this extent: I think it is multiple hearsay. I'm not persuaded that the present sense impression exception applies or that this is really offered to essentially question the police investigation or so on. Obviously I think that the thrust of this is to further point the finger at Jason Chapman, which as I said, I think there is a basis to do. But I do not see this as a proper basis given the evidence rules for the defense to be able to bring this out specifically by, for example, calling Ms. Hartzell and asking her to relate the hearsay statement that she heard the victim reportedly make quoting Mr. Chapman.
>
> On the other hand, I do see, given what I've heard thus far, [defense counsel] as having a good faith basis to ask the question on cross. How Mr. Chapman responds to that question, if it is asked, is something that -- I believe since there is a good faith basis to ask the question -- is something I think for the jury to be able to evaluate. My inclination would be that's as far as it goes. [Defense counsel] will probably have to take the answer that she gets. But as to asking the question, I think there's a good faith basis to ask it as part of her cross.
>
> So until I am convinced otherwise, that essentially would be the position of the Court; that this is to be excluded in terms of testimony. But in terms of what's inquired on cross-examination, given the relevance of Jason Chapman as being a potential suspect, I think it is fair game for the defense to at least ask the question.

Even if the court erred in excluding the alleged threat as proof of motive, because Benjamin was allowed to question Jason Chapman about the alleged threat, there is no reasonable probability that the error materially affected the outcome of the trial.[12]

---

[12] State v. Halstien, 122 Wn.2d 109, 127, 857 P.2d 270 (1993).

31

Closing Argument

Benjamin contends prosecutorial misconduct requires reversal. Benjamin asserts the prosecutor improperly shifted the burden of proof, commented on his right to not testify, and undermined the presumption of innocence by repeatedly arguing the defense could not explain the presence of Benjamin's DNA on Angela's left breast.

The State must prove the elements of the charged crime beyond a reasonable doubt. In re Winship, 397 U.S. 358, 361, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). It is improper for the prosecutor to argue that the defendant carries the burden of proof. State v. Thorgerson, 172 Wn.2d 438, 453, 258 P.3d 43 (2011). A defendant has no duty to present evidence, and it is error for the State to suggest otherwise. State v. Cheatam, 150 Wn.2d 626, 652, 81 P.3d 830 (2003).

To prevail on a claim of prosecutorial misconduct, the defendant must establish the challenged conduct was both improper and prejudicial. Cheatam, 150 Wn.2d at 652. The court considers a claim of prosecutorial misconduct in the context of the entire argument, the issues in the case, the evidence, and the instructions given to the jury. State v. Emery, 174 Wn.2d 741, 764 n.14, 278 P.3d 653 (2012).

Where a defendant does not object, the defendant waives the error unless the misconduct was "so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." Emery, 174 Wn.2d at 760-61. The defendant must show that "(1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the

jury verdict.' " Emery, 174 Wn.2d at 761 (quoting Thorgerson, 172 Wn.2d at 455).[13]

The appellate court focuses on whether the resulting prejudice could have been cured. Emery, 174 Wn.2d at 762.

Benjamin contends that the argument the prosecutor made at the beginning of closing argument improperly shifted the burden of proof. The prosecutor argued that the evidence showed Benjamin, not Mike Pettifer or Jason Chapman, committed the murder, and the defendant had "no innocent explanation" for the DNA found on Angela's left breast. Without an objection, the prosecutor argued:

> In opening statements the defense attorney . . . indicated that this was a mystery, that the homicide, the murder of Angela Pettifer was a mystery that was not going to be solved. I beg to differ. I would suggest to you that each and every bit of evidence that you heard over the course of a week, as tedious as some of it may have been, has put solve to Angela's murder.
> The defense has thrown up two alternate suspects, Jason Chapman and Mike Pettifer, as the real killers. In the business we call that the SODDI defense; some other dude did it. In this particular case, they're throwing up two of them. The evidence in this case will be pretty clear that neither of them either could or did kill Angela Pettifer. We will get to that in a bit.
> But what I would suggest that when you go back into the jury room and you listen to me talk and you listen to [defense counsel] talk about what the evidence is and what the law is, keep in your mind exactly what was testified in this courtroom and what was not.
> The evidence that you heard was from the witnesses on the stand, from the evidence that was admitted; pictures, photographs, diagrams, the 911 tapes, the statement the defendant made to the police, and the testimony of the various people that were up on the witness stand.
> Ultimately what you have heard over the course of this trial is the defendant had the means, the motive, the opportunity and most importantly has no innocent explanation for his DNA being on her left nipple and areola. The only explanation for that is homicidal in this particular instance. The defendant killed Angela Pettifer in her bedroom,

---

[13] Benjamin contends the constitutional harmless error standard applies to his claim of prosecutorial misconduct. In Emery, our supreme court declined to adopt the constitutional harmless error standard where the prosecutor misstated the burden of proof and improperly argued the defendant carried the burden to produce evidence. Emery, 174 Wn.2d at 757-59; see also Thorgerson, 172 Wn.2d at 455.

and the evidence that you've heard over the course of this trial has proven that.[14]

Without objection, the prosecutor then addressed the to-convict jury instruction and the State's burden of proving that Benjamin caused the death of Angela, and argued that the only issue was whether "this guy didn't do it."

> The first one is what we call the "to convict" instruction. It essentially lays out the elements of the crime; what needs to be proven. On or about the 15th day of August 2010, the defendant acted with the intent to cause the death of Angela Pettifer. Element number two, the defendant, in fact, did cause the death of Angela Pettifer. And, three, that these acts occurred in the State of Washington.
>
> The "to convict" instruction in this particular case I would suggest to you comes down to only one issue. And that is: Did the State prove that it was this guy that strangled Angela Pettifer? Based on the evidence that you heard, particularly from Dr. Thiersch, I don't expect any serious argument that anyone who spent at a minimum of four to five minutes strangling somebody, whether it was manually or some type of ligature, had anything other on their mind but to kill the person that they were strangling.
>
> The real issue here is: Do we have the right guy sitting in front of you? Not whether this was intentional, reckless, or something of that nature. This is clearly a murder. <u>This is clearly an intentional murder. And the only issue for you folks to decide when you go back into the jury room is if this guy didn't do it.</u>[15]

In two other instances, the defense objected to the prosecutor's arguments and the court gave a curative instruction. First, in addressing the evidence presented during the trial, the prosecutor argued:

> The evidence that you've heard, everyone who testified on this particular issue, is the defendant and Angela did not know each other. They had no romantic relationship. They had no interaction other than that at the door of the third floor at the Savoy Building. <u>And the reason this is important is you have to come up with some explanation for his DNA on her left nipple.</u>[16]

Defense counsel objected. The court sustained the objection and instructed the jury to

---

[14] (Emphasis added.)
[15] (Emphasis added.)
[16] (Emphasis added.)

disregard the prosecutor's argument and reiterated that the State has the burden of proof. The court instructed the jury: "I will sustain the objection. The jury will disregard that. I will remind the jury that the State alone bears the burden of proof in this matter."

During rebuttal, the prosecutor argued:

> One thing that I kept waiting for throughout the entirety of the defendant's lawyer's closing argument was an explanation for one bit of evidence. How do you account for the DNA on her left nipple?

Defense counsel objected. The court sustained the objection and instructed the jury as follows: "I will sustain, and the jury will disregard. The jury's reminded that the State bears the burden of proof solely in this case."[17]

Benjamin cannot establish prejudice as to the two arguments objected to at trial. The trial court gave a curative instruction reiterating that the State carries the burden of proof. We presume the jury follows the instructions of the court. State v. Southerland, 109 Wn.2d 389, 391, 745 P.2d 33 (1987). Benjamin cannot establish prejudice as to the two arguments he challenges for the first time on appeal. Benjamin cannot show any prejudice that could not have been addressed by a curative instruction.[18]

Cumulative Error

Benjamin contends cumulative error denied him a fair trial. The cumulative error doctrine applies when several trial errors occur which standing alone may not be sufficient to justify reversal, but when combined deny a defendant a fair trial. State v.

---

[17] Because the prosecutor's argument in rebuttal that "[t]here is no innocent explanation for that DNA" was in direct response to the defense argument, it was not improper. State v. Russell, 125 Wn.2d 24, 87, 882 P.2d 747 (1994). Further, the defense did not object.

[18] Benjamin also argues that the prosecutor violated his Fifth Amendment rights by improperly commenting on Benjamin's failure to testify. Because the prosecutor's statements were not "of such character that the jury would naturally and necessarily accept it as a comment on the defendant's failure to testify," Benjamin's Fifth Amendment rights were not violated. State v. Ramirez, 49 Wn. App. 332, 336, 742 P.2d 726 (1987) (internal quotation marks and citation omitted).

Greiff, 141 Wn.2d 910, 929, 10 P.3d 390 (2000).  We conclude Benjamin was not denied a fair trial.

We affirm.

WE CONCUR: