FILED
COURT OF APPEALS
DIVISION II

2014 MAR 19 AM 8:48

STATE OF WASHINGTON
BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 43576-4-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| JEANNE BELLE BARRINGER, | |
| Appellant. | |

BJORGEN, J. — After denying her motion to suppress evidence of drug possession, the

trial court convicted Jeanne Barringer of possession of a controlled substance following a bench

trial on stipulated facts. Barringer appeals, asking us to reverse the denial of her motion to

suppress, claiming the police unlawfully detained her and coerced her consent to search her

property. We hold that Barringer's detention was a lawful investigative stop and that she

provided valid consent to the search of her purse. We affirm.

## FACTS

In February 2012, on a snowy night, Officer Perry Royle responded to the scene of a

collision on State Route 12 near Morton, arriving at 7:42 p.m.[1] Royle found a Chevrolet Blazer

in a ditch at the side of the road and two people, Barringer and Michael Hartley, sitting inside the

vehicle. When Royle approached, Barringer sat in the driver's seat and Hartley occupied the

passenger seat. Royle began investigating the collision as a possible traffic infraction and asked

Barringer what had happened. She stated that "she just drove off the road." Reporter's

Transcript on Appeal (RTA) (May 30, 2012) at 6.

---

[1] Police use the term "collision" to describe one-car incidents like this one, apparently to avoid
any confusion with the term "accident," which implies no liability for the collision. *See*
Reporter's Transcript on Appeal (RTA) (May 30, 2012) at 4-5, 10.

Washington State Patrol Trooper Nathan Hovinghoff arrived on scene roughly 10 minutes after Royle did. Like Royle, Hovinghoff began investigating the incident as a possible traffic infraction. He asked Barringer what had happened, and she again stated that she drove off the road.

Hovinghoff then noticed that Hartley was the passenger. He found this suspicious because he had seen Hartley driving the vehicle earlier in the day, "trying so hard to look inconspicuous that he really stood out." RTA (May 30, 2012) at 17. After running Hartley's name through dispatch, Royle discovered that he had a suspended license. Hovinghoff then asked Barringer to step out of the SUV (sports utility vehicle) so that he could question her in private. When asked if she had told the truth about the collision, Barringer admitted that she had lied and that Hartley had actually driven the car off the road. Hovinghoff arrested Hartley for driving with a suspended license, handcuffed him, read him his *Miranda*[2] rights, and placed him in a patrol car.

Alarmed at the prospect of "trouble," Hartley offered to deal "information" for consideration on the suspended license charge. RTA (May 30, 2012) at 19. Hartley eventually told Hovinghoff that the collision occurred while he and Barringer returned from a visit to her dealer, where she had purchased an ounce of methamphetamine.[3] Hartley agreed to allow Hovinghoff to name him in a search warrant for a search of Barringer's person. During this conversation, Hartley admitted to driving the car into the ditch. Hovinghoff determined that

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[3] Hartley ultimately did not receive any consideration for this information.

Hartley's admission gave him "reasonable suspicion that Ms. Barringer had committed the crime of making a false statement to a public servant." RTA (May 30, 2012) at 21.

Hovinghoff returned to the SUV and asked Barringer for consent to search her person for methamphetamine. Hovinghoff advised her of her *Ferrier*[4] rights, namely that she could refuse to consent, restrict where he could look, or revoke her consent at any point. Barringer gave consent for a search of her physical person, but claimed she could not consent to a search of the SUV because it did not belong to her.

Hovinghoff searched Barringer and found no methamphetamine. He nonetheless decided to detain her. He handcuffed her, provided her *Miranda* rights to her, and placed her in the back of Royle's vehicle. Hovinghoff again asked Barringer who had driven the SUV into the ditch, and again she stated that Hartley had done so. Hovinghoff concluded that Barringer's admission gave him probable cause to arrest her for making a false statement. Hovinghoff then asked Hartley for more information on where she might have hidden the drugs and sought consent to search the SUV. Hartley consented and informed Hovinghoff that Barringer's purse was in the SUV.

Hovinghoff returned to Barringer and asked for permission to search her purse, which she refused to give. Hovinghoff then told Barringer that he would apply for a warrant unless she consented, but he specifically told her the judge might not grant his application. Barringer declined to consent and a search of the vehicle, excluding the purse, disclosed no methamphetamine.

---

[4] *State v. Ferrier*, 136 Wn.2d 103, 118, 960 P.2d 927 (1998).

At this point Hovinghoff determined the scene was unsafe because of the falling snow[5] and summoned a local company to tow the SUV to Morton. Hovinghoff drove Hartley to the company's offices; Royle took Barringer. At 8:57 p.m., Hovinghoff summoned a canine unit to the tow company's lot to search for the methamphetamine and began to write out an application for a warrant.[6]

Around this time Hovinghoff decided a strip search of Barringer was necessary. Hovinghoff asked Barringer whether she would consent to allowing a newly arrived female officer to perform the search and she said she would. Barringer and the officer went to the Morton police station for the search, which disclosed no drugs.

When Barringer returned, Hovinghoff resumed applying for a warrant to search her purse. Meanwhile, Barringer and the female officer sat and talked in the back of the officer's squad car. Barringer eventually consented to a search of the purse after telling the officer she was concerned Hovinghoff would find a small amount of marijuana and being assured that Hovinghoff would not care about that. Hovinghoff once again gave Barringer her *Ferrier* warnings and Barringer told Hovinghoff not to look in the purse's front pocket. Hovinghoff informed Barringer that, if he did not get consent to search the whole purse, he would apply for a warrant, which a judge might not grant. Barringer then consented to a search of the whole purse, and Hovinghoff found two plastic bags containing methamphetamine. Based on this evidence, Hovinghoff arrested Barringer for possession of methamphetamine at 10:38 p.m.

---

[5] This was not an unreasonable decision. A semi-truck had nearly collided with one of the police vehicles after losing control on the slick road.

[6] The canine unit later arrived, but the dogs never alerted while passing by the SUV or a collection of purses that included Barringer's.

4

No. 43576-4-II

The State charged Barringer with possession of a controlled substance in violation of RCW 69.50.4013 and RCW 69.50.206(d)(2).[7] Barringer moved to suppress evidence of the methamphetamine, contending that the scope of the investigative stop exceeded constitutional limits due to its duration and that she had not given valid consent for the search of the purse. On the motion to suppress, the trial court found that the police began the stop to investigate the collision and had expanded the stop to investigate Hartley's driving with a suspended license, Barringer's false statements, and Barringer's possession of methamphetamine. The trial court further found that Hovinghoff had specifically told Barringer that he could not search her purse without her knowing and voluntary consent or a warrant. The trial court also found that Hovinghoff specifically told her that, in the absence of consent, he would apply for a warrant and that a judge might not grant his application. Based on these findings, the trial court concluded that the initial detention of Barringer to investigate the collision was lawful and that police continued to lawfully detain Barringer while they investigated other crimes. The trial court also concluded that Barringer voluntarily consented to the search of her purse. From these conclusions, the trial court denied Barringer's motion to suppress. Barringer proceeded to a bench trial on stipulated facts, and the trial court found her guilty.

Barringer appeals the trial court's denial of her motion to suppress the evidence found in her purse, asking that we reverse the trial court's order, reverse her conviction, and dismiss the charges against her with prejudice.

---

[7] These provisions make it unlawful to possess methamphetamine or its salts, isomers, or salts of isomers.

5

ANALYSIS

Barringer challenges several of the trial court's findings and conclusions supporting its ruling that the police lawfully detained Barringer as part of a valid investigative stop and that she provided voluntary consent to the search of her purse. We review a trial court's findings of fact regarding the suppression of evidence to determine if substantial evidence supports them. *State v. Winterstein*, 167 Wn.2d 620, 628, 220 P.3d 1226 (2009). We find such evidence "where there is a sufficient quantity of evidence in the record to persuade a fair-minded, rational person of the truth of the finding." *State v. Schultz*, 170 Wn.2d 746, 753, 248 P.3d 484 (2011). Unchallenged findings are verities on appeal. *State v. Eserjose*, 171 Wn.2d 907, 912, 259 P.3d 172 (2011). We review de novo the trial court's conclusions that the investigative stop was valid and that Barringer consented to the search of her purse. *Winterstein*, 167 Wn.2d at 628.

I. FINDINGS OF FACT

Barringer first challenges finding of fact 1.7, which states, in relevant part, that "Trooper Hovinghoff recognized Mr. Hartley as the driver of the same Chevy at approximately 1630 hours that same day." Clerk's Papers (CP) at 5. As Barringer correctly argues, no evidence in the record established the time of Hovinghoff's previous encounter with Hartley. Therefore, we vacate the portion of this finding of fact stating that the encounter occurred at 4:30 p.m.

Barringer next challenges finding of fact 1.12 and 1.28, which provide that the officers found Hartley credible based on his cooperation, willingness to allow Hovinghoff to name him in the warrant application, previous interactions with the officers, and the level of detail he provided in discussing Barringer's methamphetamine possession. Barringer claims that the officers' subjective belief in Hartley's reliability is irrelevant to the existence of probable cause.

We need not vacate the trial court's findings of fact because Barringer disagrees with a legal conclusion drawn from them and, regardless, find the officers' subjective intent relevant because Barringer raises claims of pretext. The officers testified they found Hartley credible based on the factors described. We therefore find substantial evidence supporting the findings and affirm them.

Barringer next challenges finding of fact 1.15, which states, in relevant part, that "Trooper Hovinghoff conducted a pat-down search of the outside of the Defendant's clothing and did not locate anything." CP at 7. Barringer claims that "Hovinghoff did not reveal how he conducted the initial search of [Barringer's] person" and asks that we vacate the finding in that regard. Br. of Appellant at 5 n.5. Hovinghoff testified that he sought and obtained Barringer's permission to search her person. Hovinghoff also testified that Barringer consented and that he searched her person. Hovinghoff did not need to obtain permission for an inspection using sight or smell, meaning that a rational, fair-minded person would interpret his testimony as discussing a pat-down search. *See State v. Tibbles*, 169 Wn.2d 364, 373 n.4, 236 P.3d 885 (2010). We find substantial support for the finding in the record and affirm it.

## II. THE SEIZURE OF BARRINGER

Barringer argues her detention violated her rights to privacy and freedom from unreasonable seizure for two reasons. First, Barringer contends that the investigative stop exceeded constitutional boundaries based on its two-and-a-half hour length and the investigative techniques police used during that time. Second, she claims that the police lacked probable cause to arrest her for possession and that any justification of the arrest on the grounds that police had probable cause to believe she had made false statements amounted to pretext.

Barringer's first claim fails because police arrested her within a constitutional period of time after beginning the stop, and they did not use the investigative techniques she objects to before her arrest. Barringer's second claim fails because police make a valid warrantless arrest if they have probable cause to believe the arrestee has committed *any* offense, even if not the one they announce as the crime of arrest.

A.      The Investigative Stop

Both parties agree that, at some point, Hovinghoff arrested Barringer, but they dispute when that happened. Because the limits on intrusiveness and duration placed on an investigative stop do not apply to an arrest, Barringer's claim requires us to determine (1) when Hovinghoff arrested her, and (2) whether the duration and intrusiveness of the investigation before the stop matured into an arrest exceeded constitutional limits. We hold that the police arrested Barringer before 8:57 p.m. and that her detention before that time complied with governing constitutional standards.

The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause." The Fourth Amendment generally requires police to secure a warrant supported by probable cause before engaging in a search or seizure, subject to limited exceptions. *Minnesota v. Dickerson*, 508 U.S. 366, 372, 113 S. Ct. 2130, 124 L. Ed. 2d 334 (1993). Valid investigative stops and arrests for offenses committed in the presence of an officer are both among the exceptions to the

warrant requirement. *Terry v. Ohio*, 392 U.S. 1, 20, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968); *Atwater v. City of Lago Vista*, 532 U.S. 318, 121 S. Ct. 1536, 149 L. Ed. 2d 549 (2001).[8]

An investigative stop allows police to effect a limited warrantless seizure of a person or property in order to confirm or dispel a reasonable suspicion of criminal activity. *United States v. Place*, 462 U.S. 696, 702-06, 103 S. Ct. 2637, 77 L. Ed. 2d 110 (1983). Although supported by less than probable cause, an investigative stop is reasonable under the Fourth Amendment based on a balance of countervailing interests, namely the individual's interests in freedom from restraint or search and the State's interest in the detection and prevention of criminal activity. *Place*, 462 U.S. at 703-06. A stop must be "justified at its inception" and "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 20; *see State v. Ladson*, 138 Wn.2d 343, 350, 979 P.2d 833 (1999). A stop is "justified at its inception," where officers can "point to specific and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant" the stop. *Terry*, 392 U.S. at 19-22; *State v. Arreola*, 176 Wn.2d 284, 292-93, 290 P.3d 983 (2012). A stop is "reasonably related in scope to the circumstances which justified [the stop] in the first place" where it is minimally intrusive and of a short duration. *Terry*, 392 U.S. at 20, 24-27; *see Arreola*, 176 Wn.2d at 292-93. Assuming the police have reasonable suspicions of criminal activity and do not engage in

---

[8] Article I, section 7 of the Washington State Constitution provides that "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law." Regarding investigative stops, article I, section 7 and the Fourth Amendment provide coextensive protection from impermissible seizure and we reach the same result whether we analyze Barringer's appeal under the state or federal constitutions. *See State v. Kennedy*, 107 Wn.2d 1, 4-6, 9, 726 P.2d 445 (1986).

lengthy or intrusive investigation, the stop is reasonable under the Fourth Amendment because the balance of interests favors the State. *Terry*, 392 U.S. 20-27.

In contrast, due to its intrusiveness a custodial arrest cannot be justified by a balancing of the arrestee's and State's interests. *See Terry*, 392 U.S. at 25-27. Instead, the intrusiveness of an arrest requires justification with probable cause to believe the arrestee has committed a crime. *Dunaway v. New York*, 442 U.S. 200, 208-12, 99 S. Ct. 2248, 60 L. Ed. 2d 824 (1979); *see Terry*, 392 U.S. at 25-27.

We determine when the police arrested Barringer using an objective test. *State v. Reichenbach*, 153 Wn.2d 126, 135, 101 P.3d 80 (2004). We look to "whether a reasonable detainee under th[e] circumstances would consider himself or herself under a custodial arrest." *Reichenbach*, 153 Wn.2d at 135.

Viewing the events objectively, we hold that Hovinghoff arrested Barringer before 8:57 p.m., the time Hovinghoff testified he summoned the canine unit to the towing company lot. Barringer claims that the arrest occurred at 10:38 p.m. because Hovinghoff announced her arrest for possession at that time. Hovinghoff's intentions, however, are irrelevant to whether or when he arrested Barringer. *Reichenbach*, 153 Wn.2d at 135 (test is objective, rather than the subjective intent of police officers). Some minutes before 8:57 p.m.[9] Hovinghoff told Barringer that he was detaining her. He then handcuffed her, placed her in his squad car where she could

---

[9] Hovinghoff testified that he requested the canine unit at 8:57 p.m., meaning that he had already arrested Barringer, called for a tow truck, waited for the tow truck to arrive, and then transported Barringer to the tow truck's parking lot by that point. However, because the State bears the burden of justifying warrantless seizures or arrests, it bears the burden of establishing the time this stop matured into an arrest. *See State v. Potter*, 156 Wn.2d 835, 840, 132 P.3d 1089 (2006). Because the State failed to present evidence as to the actual time of arrest, the best that we can say is that it occurred sometime before 8:57 p.m. and consider this the time the investigative stop ended.

not exit, and gave the *Miranda* warnings to her. No reasonable person could believe that he or she could freely leave under these circumstances. Thus, Hovinghoff arrested Barringer at this point. *State v. Williams*, 102 Wn.2d 733, 740, 689 P.2d 1065 (1984) (handcuffing and isolating a suspect can indicate an investigative stop has become a custodial arrest).

Having determined when Hovinghoff arrested Barringer, we must then work backward to see if the investigative stop became invalid before it matured into an arrest. To that end, we examine the purpose of the stop, the intrusiveness of the investigation, and the length of the stop. *Place*, 462 U.S. at 706-10.

The first factor, the purpose of the stop, indicates that the officers' actions before Barringer's arrest were a constitutionally sound investigative stop. Barringer asks us to look to the offenses the police were investigating and to conclude a "lengthy and intrusive detention" was unnecessary. Br. of Appellant at 14. However, under this portion of our analysis we do not look to the type of crime at issue, but rather whether the police officers' actions related to the purpose of the stop, such as questioning the suspect to confirm or dispel the suspicions that led to the stop. *Florida v. Royer*, 460 U.S. 491, 498-99, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983); *Williams*, 102 Wn.2d at 740. Royle and Hovinghoff consistently questioned Barringer and Hartley about the possible crimes they were investigating. At each stage of the investigative detention, Hovinghoff had his "initial suspicions . . . confirmed or . . . further aroused," which allowed him to expand and lengthen the stop as he investigated new crimes. *State v. Acrey*, 148 Wn.2d 738, 747, 64 P.3d 594 (2003).

The second factor also weighs in favor of finding this a permissible investigative stop. Barringer cites some of the more intrusive techniques that Hovinghoff used to investigate, such

as the strip search, and asks us to hold that these rendered the stop unconstitutional. However, Hovinghoff and Royle did not employ these techniques before Barringer's arrest.[10] During the investigative stop, Hovinghoff and Royle simply asked Barringer questions to "obtain[] more information." *Adams v. Williams*, 407 U.S. 143, 146, 92 S. Ct. 1921, 32 L. Ed. 2d 612 (1972). Law enforcement agents may ask a detainee "to explain suspicious circumstances" without exceeding the scope of an investigative stop. *United States v. Brignoni-Ponce*, 422 U.S. 873, 881-82, 95 S. Ct. 2574, 45 L. Ed. 2d 607 (1975).

The third factor, the length of the stop, is a closer call, but also suggests a valid stop. In *Place*, the Supreme Court refused to establish a bright-line rule for the permissible duration of an investigative stop, but held that under the facts presented a 90 minute detention "alone preclude[d] the conclusion that the seizure was reasonable in the absence of probable cause." 462 U.S. at 709. Our Supreme Court has determined that a 35 minute stop "approach[ed] excessiveness." *Williams*, 102 Wn.2d at 741 & n.4. Nonetheless, we hold that this stop did not last an excessive length of time for two reasons.

First, as noted above, this stop began at 7:42 p.m. and ended at some point before 8:57 p.m. During this time, Hovinghoff and Royle had their suspicions further aroused several times and investigated several new crimes based on Hartley's and Barringer's statements. This permitted Hovinghoff and Royle to "continue" to detain Barringer and Hartley while they "expand[ed]" their inquiry into other possible criminal wrongdoing. *State v. Garland*, 482 A.2d 139, 144 (Me. 1984); *State v. Fitzherbert*, 361 A.2d 916, 919-20 (Me. 1976). *Place* and

---

[10] Even if we were to consider these techniques, Barringer freely and knowingly consented to each search and therefore has waived her claims about the intrusiveness of Hovinghoff's investigation. *Schultz*, 170 Wn.2d at 754.

*Williams* considered the permissible duration of stops involving the investigation of a single crime; they do not define the outer bounds of a stop where police must investigate multiple types of criminal activity. An hour, approximately, does not seem like an unreasonable period of time to investigate at least four possible crimes: the initial collision, Hartley's driving with a suspended license, Barringer's false statements, and Barringer's possession of methamphetamine.

Second, we assess the duration of a stop in light of the diligence of officers in performing their investigation. *Place*, 462 U.S. at 709-10. Here, there is no evidence the officers did anything but diligently pursue their investigation. While Barringer claims that Royle did not diligently investigate while waiting for Hovinghoff to arrive, the trial court found that he did so. CP at 5 (finding of fact 1.4, wherein the trial court found that Royle investigated the collision by asking if Hartley and Barringer needed medical attention and asked for Barringer's license and proof of insurance.) This finding is a verity on appeal as Barringer did not challenge it. The investigative stop met constitutional standards.

B.    Probable Cause

Barringer also contends that her arrest violated her right to freedom from pretextual seizure. The argument consists of two parts: first, Barringer alleges the police lacked probable cause to arrest her on possessory offenses because of Hartley's unreliability; second, she claims that because the police could not arrest her on possessory offenses, their arrest of her for making false statements was an impermissible pretext. We hold that the police had probable cause for an arrest based on Barringer's false statements and that because the police had no subjective intent to circumvent any constitutional protections, they did not act pretextually.

13

No. 43576-4-II

Where an investigative stop becomes an arrest, the police must have probable cause to believe the suspect has committed a crime. *See Dunaway*, 442 U.S. at 208; *Williams*, 102 Wn.2d at 740; *accord* 3 WAYNE R. LaFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 5.1, at 4-5 (4th ed. 2004). If the police lack probable cause, the arrest is constitutionally invalid and any evidence seized is tainted and inadmissible. LaFAVE, *supra*, § 5.1(a) at 4-5. Police have probable cause to make a warrantless arrest where "the arresting officer is aware of facts or circumstances, based on reasonably trustworthy information, sufficient to cause a reasonable officer to believe a crime has been committed." *State v. Gaddy*, 152 Wn.2d 64, 70, 93 P.3d 872 (2004) (emphasis omitted).

RCW 9A.76.175 proscribes "knowingly mak[ing] a false or misleading material statement to a public servant." Hovinghoff had reasonably trustworthy information sufficient to cause a reasonable officer to believe that Barringer's conduct satisfied all of the elements of RCW 9A.76.175. Barringer deliberately lied to Hovinghoff and Royle when she initially told them she had been driving, and later admitted to having done so to cover Hartley's crime of driving with a suspended license. Barringer's statement was material to the investigation of traffic infractions related to the collision in that it hid who had driven the vehicle into the ditch. Both Royle and Hovinghoff are public servants who were acting in their official capacities when Barringer lied to them. Hovinghoff had probable cause to arrest her and to do so without a warrant given that she made the false statements in his presence. RCW 10.31.100; *Atwater*, 532 U.S. at 354.

Barringer argues that, while Hovinghoff had probable cause to arrest her for providing a false statement, he did not do so, and instead arrested her for drug possession, which he lacked

14

probable cause to arrest her for. However, as long as the police have probable cause to believe that the defendant has committed a crime, any subjective intent to arrest on a different crime on the part of police is irrelevant and the arrest is constitutional. *State v. Huff*, 64 Wn. App. 641, 645-46, 826 P.2d 698 (1992) ([a]n arrest supported by probable cause is not made unlawful by an officer's subjective reliance on, or verbal announcement of, an offense different from the one for which probable cause exists."); *City of Seattle v. Cadigan*, 55 Wn. App. 30, 36, 776 P.2d 727 (1989) ("The absence of probable cause to believe that a person committed a particular crime for which a person was arrested does not create an invalid arrest if, at the time of the arrest, the police had sufficient information to support an arrest of the person on a different charge."); *State v. Stebbins*, 47 Wn. App. 482, 485-86, 735 P.2d 1353 (1987) (surveying cases and reasoning that they command courts to affirm an arrest where "probable cause exist[s] to support an arrest on *any* charge."). Here, Hovinghoff knew he had probable cause to arrest Barringer for false swearing based on her and Hartley's admissions to him before he arrested her. The arrest was constitutional.

Barringer's related pretext claim also lacks merit. Pretextual searches or seizures are forbidden by article I, section 7 of the Washington Constitution because they allow police officers to circumvent constitutional protections and search or seize where they would not otherwise have the authority to do. *Arreola*, 176 Wn.2d at 294. Claims of pretext require that the officer subjectively intend to make the search or seizure for constitutionally infirm reasons. *Arreola*, 176 Wn.2d at 295. As noted when discussing Barringer's challenge to the trial court's findings of fact, Hovinghoff subjectively believed Hartley was credible, meaning that he subjectively believed he had probable cause to arrest Barringer for both false swearing and

possession of a controlled substance. We therefore cannot say that justification of the arrest based on the false swearing was pretextual. Hovinghoff did not make the "end run" around article I, section 7 necessary for a successful pretext claim.

### III. THE SEARCH OF BARRINGER'S PURSE

Barringer's final contention is that she did not give "free and voluntary consent" to search her purse, and that the search was therefore invalid. Br. of Appellant at 20. She contends that Hovinghoff's statement that he would apply for a warrant coerced her into waiving her right to be free from search. We disagree.

A person may waive his or her freedom from unreasonable or unlawful searches by consent. *Illinois v. Rodriguez*, 497 U.S. 177, 183-84, 110 S. Ct. 2793, 111 L. Ed. 2d 148 (1990); *Schultz*, 170 Wn.2d at 754. Because a warrant requires a suspect to submit to a search, police may not claim that the suspect consented by allowing a search authorized by a warrant if a court later finds the warrant invalid. *Bumper v. N. Carolina*, 391 U.S. 543, 548, 88 S. Ct. 1788, 20 L. Ed. 2d 797 (1968). Extending this logic, Division Three of our court has held that police also may not rely on consent obtained by misrepresenting their authority to obtain a warrant. *State v. Apodaca*, 67 Wn. App. 736, 739-40, 839 P.2d 352 (1992), *overruled on other grounds by State v. Mierz*, 127 Wn.2d 460, 901 P.2d 286 (1995).

Barringer's consent claim must fail because Hovinghoff never misrepresented his authority regarding the search. A police officer does not coerce a defendant to give consent by telling the defendant that he or she will seek a warrant unless consent is given. *State v. Smith*, 115 Wn.2d 775, 790, 801 P.2d 975 (1990) (distinguishing an officer's threat to seek a warrant

No. 43576-4-II

from an officer's false representation that he or she possesses a warrant and holding that the threat to seek a warrant does not coerce a defendant into providing consent).

The trial court found that Hovinghoff told Barringer that he would seek a warrant if she would not consent to a search of her purse. The trial court found that Hovinghoff was quite explicit that the trial court might not grant him a warrant, but that he would attempt to procure one. Barringer has not challenged these findings and they are verities on appeal. Barringer argues that, given the failure to corroborate Hartley's statements with any of the searches, including the one by the canine unit, Hovinghoff could not have obtained a warrant. That is irrelevant. Hovinghoff had enough evidence to seek a warrant, and that is all that he promised to do. We affirm the trial court's conclusion that Barringer gave valid consent.

CONCLUSION

We affirm the trial court's denial of Barringer's motion to suppress the evidence and affirm her conviction for the possession of methamphetamine.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record pursuant to RCW 2.06.040.

BJØRGEN, J.

We concur:

JOHANSON, A.C.J.

MAXA, J.

17