[No. 49749–4. En Banc. October 18, 1984.]

THE STATE OF WASHINGTON, *Respondent,* v. JOHN
L. WILLIAMS, *Petitioner.*

*Raymond H. Thoenig* of *Washington Appellate Defender Association,* for petitioner.

*Norm Maleng, Prosecuting Attorney,* and *Barbara Corey–Boulet, Deputy,* for respondent.

ROSELLINI, J.—Petitioner, John L. Williams, was convicted of second degree burglary and first degree theft. The charges were based, in part, on evidence found in the course of a search of petitioner's vehicle following his detention by police for questioning. The trial judge denied petitioner's motion to suppress the evidence, and the Court of Appeals, Division One, affirmed (*State v. Williams,* 34 Wn. App. 662, 663 P.2d 1368 (1983)). We reverse.

On April 7, 1981, Kirkland Police Officer Bruce Johnson responded to a radio dispatch request to investigate a burglar alarm sounding[1] in a nearby residence. As Officer Johnson approached the house in his vehicle, he spotted a car parked in front of it. The car appeared to be empty but as the officer drove closer, the headlights went on and the car started to move.

Officer Johnson called for a backup and pulled his squad

---

[1] As the alarm was a silent type, the alarm sounded only at the security service which then requested police assistance to investigate the potential intruder.

car directly across the other vehicle's path. He told the driver (petitioner) to shut the car off, throw the keys outside and put his hands on the interior roof of the car. When Johnson's backup officer arrived, petitioner was ordered out of the car, patted down, handcuffed, advised of his rights, and placed in the backseat of one of the patrol cars.

Officer Johnson next advanced toward the house and noted that the front door was closed but unlocked. He then returned to his car and requested a canine unit.

Officer Johnson then turned to the petitioner, who was still being held in the other squad car, and asked him what he was doing in the area. The petitioner informed Johnson that he was looking for a friend's house. When Officer Johnson asked for the address, petitioner stated that he didn't know it. Responding to Officer Johnson's question concerning why he left when Johnson approached, petitioner stated that he had had problems with his headlights and was just pulling away.

Upon arrival of the canine unit, the police searched the interior of the house. They discovered that the master bedroom had been ransacked, the rear sliding door had been left ajar and the kitchen window left opened. Outside the house, the police discovered a portable television left sitting near the carport.

Police Officer Ivy "inventoried" the car for valuables and discovered a black jewelry box underneath the driver's seat. He opened the box, saw it contained jewelry, and returned the box to its original place. The car was then sealed and transported to Redmond Yard for safekeeping until a search warrant could be obtained. Petitioner was taken to the police station.

Prior to trial, petitioner moved to suppress evidence seized from the car. This motion was denied. Petitioner was convicted of second degree burglary and first degree theft.

Division One of the Court of Appeals affirmed the conviction. This court granted review to decide whether the evidence found in petitioner's car was the product of an illegal search or seizure. For the reasons stated below, we

reverse.

We start with the basic principles governing the Fourth Amendment and Const. art. 1, § 7. The core of these protections is the right of the individual to be protected against unreasonable searches and seizures. As a general rule, warrantless searches and seizures are per se unreasonable. *Coolidge v. New Hampshire,* 403 U.S. 443, 29 L. Ed. 2d 564, 91 S. Ct. 2022 (1971). There are, however, a few "'"jealously and carefully drawn" exceptions'" to the warrant requirement which provide for those cases where the societal costs of obtaining a warrant (such as danger to officers or the risk of loss or destruction of evidence) outweigh the reasons for prior recourse to a neutral magistrate. *State v. Houser,* 95 Wn.2d 143, 149, 622 P.2d 1218 (1980), quoting *Arkansas v. Sanders,* 442 U.S. 753–59, 61 L. Ed. 2d 235, 99 S. Ct. 2586 (1979). The burden is on the State to show that the particular search or seizure falls within one of these exceptions. *Houser,* at 149.

In the present case, the State relied on two different exceptions to the warrant requirement: the *Terry* investigative stop, and the search incident to arrest doctrine. *Terry v. Ohio,* 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968). The State's argument can be summarized as follows: the police initially engaged in an investigative stop which matured into a valid arrest when petitioner was unable to account for his presence in an area where a burglary had recently occurred. Evidence seized as a result of this arrest, concludes the State, was seized pursuant to a valid search incident to arrest or, alternatively, pursuant to a routine inventory search.

The Court of Appeals agreed; we do not. We find that the initial investigative stop, although properly initiated by suspicion of illegal activity, exceeded both the scope and purpose of such detentions permitted under Const. art. 1, § 7.

We turn first to the issue of whether petitioner's initial detention was a valid investigative stop.

Prior to *Terry v. Ohio, supra,* it was generally under-

stood that to stop and search an individual, police officers were required to have probable cause sufficient to arrest that person. Nonetheless, it was a time–honored procedure for police officers to stop suspicious persons for questioning and, occasionally, to search these individuals for dangerous weapons. 3 W. LaFave, *Search and Seizure* § 9.1(a), at 4 (1978). In *Terry,* the United States Supreme Court squarely confronted the issue of whether such stops were constitutional. The Court held that a stop–and–frisk is a sui generis "rubric of police conduct" which is reasonable under the Fourth Amendment if based upon the officer's reasonable belief that the suspect is armed and dangerous. *Terry,* at 20. The Court subsequently applied the *Terry* standard to permit a "brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information . . .". *Adams v. Williams,* 407 U.S. 143, 146, 32 L. Ed. 2d 612, 92 S. Ct. 1921 (1972).

Under *Terry,* the Court has generally approved pat–down searches for weapons, and brief, on–the–spot questioning, *see, e.g., Adams v. Williams, supra,* but disapproved of more intensive seizures without consent. For instance, in *Dunaway v. New York,* 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248 (1979), the Court held that the police had illegally seized a murder suspect when, after getting a "lead" from a police informant, they brought him to the station for questioning. In finding that the subsequent interrogation of the defendant was illegal, the Court rejected a balancing analysis and concluded that

> detention for custodial interrogation—regardless of its label—intrudes so severely on interests protected by the Fourth Amendment as necessarily to trigger the traditional safeguards against illegal arrest.

*Dunaway,* at 216.

Three recent United States Supreme Court cases highlight the parameters of the federal *Terry*–stop rule.

First, in *Florida v. Royer,* 460 U.S. 491, 75 L. Ed. 2d 229, 103 S. Ct. 1319 (1983), airport police stopped an individual

whose appearance, mannerisms, luggage and actions matched the so–called drug courier profile. The defendant, Royer, had just purchased a 1–way ticket to New York City with cash. The police officers approached Royer, identified themselves and asked to speak to him. Royer, upon request, produced his ticket and driver license. The airline ticket carried a different name than that on Royer's driver license. Royer explained that a friend had made the reservations for him. The police did not return the ticket but instead led Royer to a room where he was held while his luggage was retrieved and then opened. The Court held that Royer's confinement had exceeded the limited restraint permitted by *Terry v. Ohio, supra.* The Court observed that the scope of a permissible *Terry* stop will vary with the facts of each case, but noted that it is "clear" that *Terry* requires that an investigative detention must be temporary, lasting no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed must be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time. *Royer,* at 500.

In rejecting the State's contention that Royer's stop was not an arrest without probable cause, the Court emphasized that the temporary seizure of the defendant *must relate* to the purpose of the investigation.

The second recent decision involving the permissible scope of *Terry* stops is *Michigan v. Long,* ___ U.S. ___, 77 L. Ed. 2d 1201, 103 S. Ct. 3469 (1983). In *Long,* the Court emphasized that a major concern underlying *Terry* itself was the dangers presented to officers who must make quick decisions whether or not to search for weapons. The Court therefore held that a *Terry* frisk for weapons may extend to the passenger compartment of the detained person's vehicle. The Court apparently concluded that the extension of the "frisk" into the car is reasonable in view of the risk presented to the officer. The Court specified, however, that such a search must be premised upon a reasonable suspicion that the suspect is dangerous and may gain access to a

weapon in the vehicle.

The Court's third decision was *United States v. Place,* __ U.S. __, 77 L. Ed. 2d 110, 103 S. Ct. 2637 (1983). The Court first held that *Terry* permits investigative detentions of luggage as well as of persons. The Court then held, however, that the detention of the luggage in that case—for 90 minutes—exceeded the permissible limits of a *Terry* stop. The Court stated that

> the brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion. Moreover, . . . we take into account whether the police diligently pursue their investigation.

*Place,* 103 S. Ct. at 2645. The Court declined to adopt any "outside time limitation for a permissible *Terry* stop . . .". 103 S. Ct. at 2646. It also specifically questioned the "wisdom" of the ALI Model Code recommendation of 20 minutes as the maximum permissible period. 103 S. Ct. at 2646 n.10. The Court nonetheless concluded that the 90-minute detention "alone precludes the conclusion that the seizure was reasonable in the absence of probable cause." 103 S. Ct. at 2645.

■ The foregoing cases demonstrate that, in evaluating investigative stops, a court must make several inquiries. First, was the initial interference with the suspect's freedom of movement justified at its inception? Second, was it reasonably related *in scope* to the circumstances which justified the interference in the first place? *Terry v. Ohio, supra* at 19–20. To justify an intrusion, the police officer must be able to point to "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry,* at 21.

Our disagreement with the Court of Appeals is not over the initial interference with petitioner's freedom. We assume that that intrusion was valid under the facts of this case. It is the intensity and scope of the intrusion which we find improper.

As to this second inquiry, the United States Supreme Court has suggested at least three relevant factors in determining whether an intrusion on the suspect's liberty is so substantial that its reasonableness is dependent upon probable cause: the purpose of the stop, the amount of physical intrusion upon the suspect's liberty, and the length of time the suspect is detained.

The above cited factors, pertaining to the scope of the intrusion, weigh against the Court of Appeals holding that this was a valid *Terry* stop. To begin with, here, the purpose of the stop was not related to petitioner's detention. The police did not question petitioner but detained him until they collected evidence from the house. The police did not ask petitioner why he was in the vicinity until after they ordered him out of the car, frisked him, handcuffed him, placed him in the squad car, investigated the house, and called for the canine unit. Finally, it was not until petitioner was arrested and taken to the police station that the police inquired about his name and address.

Next, the amount of intrusion was significant, especially when considered in the light of the alleged crime. Under certain circumstances, any one of the responses, *i.e.*, handcuffing, seclusion of defendant or drawn guns, may be appropriate.[2] Under extreme circumstances, this particular combination of responses may be appropriate. But those circumstances do not exist here. The police did not and could not articulate a reason for believing that petitioner was dangerous. He made no furtive gestures or violent responses. He did not threaten the police nor did the facts of the alleged crime justify assuming that the suspect was armed or likely to harm the police. The facts simply do not support an inference that petitioner was dangerous.

Also, the detention was not related to an investigation

---

[2]Drawn guns and handcuffs, generally, are permissible only when the police have a legitimate fear of danger. *See, e.g., United States v. White*, 648 F.2d 29 (D.C. Cir. 1981) (drawn guns permissible when approaching car with three people in it who police believed were armed).

focused on petitioner. Such relationship is essential. A citizen's right to be free of governmental interference with his movement means, at a minimum, that when such interference must occur, it be brief and related directly to inquiries concerning the suspect. Very few, if any,[3] exigent circumstances justify police intrusion on a citizen's privacy without the police immediately ascertaining the suspect's identity, purpose for being in the area, and possible involvement in a crime.

Finally, the length of time involved here appears to approach excessiveness. Although the Court of Appeals characterized the stop as lasting 10 minutes, that conclusion is not supported by the record.[4]

We therefore conclude the police actions so exceeded the proper purpose and scope of a *Terry* stop as to be justified only if supported by probable cause sufficient to arrest petitioner.[5] Moreover, our conclusion is independently required by article 1, section 7 of our state constitution. That provision, most recently discussed in *State v. Chrisman,* 100 Wn.2d 814, 676 P.2d 419 (1984), states unequivocally that "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law." Const. art. 1, § 7.

 This provision differs from the federal constitution

---

[3]We can conceive of possible emergency situations where the police officers need to act quickly to protect person or property that might justify temporary restraint without asking for immediate identification. Neither the present situation nor the normal burglary investigation are such circumstances.

[4]It appears that the suspect was stopped 45 seconds in his car, then frisked and handcuffed for another 5 to 10 minutes before police asked him any questions, then detained another undeterminable length of time before the canine unit arrived and completed its investigation. Thus, petitioner's allegation that the stop took 35 minutes is closer to being an accurate estimate than that of the Court of Appeals.

[5]*State v. Byers,* 88 Wn.2d 1, 6, 559 P.2d 1334 (1977) contains language that suggests that an arrest occurs whenever a suspect is not free to go. This rule blurs the distinction between an arrest and a *Terry* stop. To the extent that this case is inconsistent with our holding today, it is overruled.

and provides heightened protection to our citizens' privacy rights. *Chrisman*, at 818; *see also State v. Ringer*, 100 Wn.2d 686, 674 P.2d 1240 (1983); *State v. Simpson*, 95 Wn.2d 170, 622 P.2d 1199 (1980). Where, as here, no probable cause exists to arrest the suspect, we believe that the language of Const. art. 1, § 7 forbids police seizures of this nature.

The Court of Appeals also recognized that at some point the police actions constituted an arrest, but concluded that this took place *after* the police acquired sufficient evidence for probable cause to make an arrest. We disagree. As evident from the facts recited above, from the outset of this police/citizen encounter, the police actions exceeded those permitted under *Terry*. Since, as respondent admits, no probable cause existed when petitioner was first detained, the detention was illegal. As the evidence admitted in petitioner's trial was a fruit of this illegal detention, it must be suppressed. *See State v. White*, 97 Wn.2d 92, 101, 640 P.2d 1061 (1982).[6]

Likewise, the State's argument that this was a valid inventory search pursuant to a routine impoundment must be rejected. The criteria for impoundment was recently set out in *State v. Simpson*, 95 Wn.2d 170, 189, 622 P.2d 1199 (1980). There, we noted:

A motor vehicle may be lawfully impounded in certain specific circumstances: (1) as evidence of a crime, if the officer has probable cause to believe that it was stolen or

---

[6]We note that under our recent decision in *State v. Ringer, supra,* the police cannot *now* engage in such searches without a warrant. In *Ringer*, this court declined to follow federal precedents governing the Fourth Amendment and searches incident to arrest. Relying on Const. art. 1, § 7, we limited police officers' right to search incident to an arrest to those circumstances when police are

confronted by emergencies and exigencies which do not permit reasonable time and delay for a judicial officer to evaluate and act upon probable cause applications for warrants by police officers.

*Ringer*, at 701, quoting *State v. Smith*, 88 Wn.2d 127, 135, 559 P.2d 970, *cert. denied*, 434 U.S. 876 (1977).

Those circumstances do not exist here.

Once petitioner was handcuffed and placed in the patrol car, it was impossible for him to either reach a weapon or destroy evidence contained in the car.

used in the commission of a felony; (2) as part of the police "community caretaking function," if the removal of the vehicle is necessary (in that it is abandoned, or impedes traffic, or poses a threat to public safety and convenience, or is itself threatened by vandalism or theft of its contents), *and* neither the defendant nor his spouse or friends are available to move the vehicle; and (3) as part of the police function of enforcing traffic regulations, if the driver has committed one of the traffic offenses for which the legislature has specifically authorized impoundment.

(Citations omitted.) These criteria do not apply here. First, the vehicle was not needed as evidence of a crime; it was neither stolen nor used in the commission of a felony. Second, because alternatives to impoundment existed, impoundment was not justified as part of the community caretaking functions. The vehicle could have been moved to the side of the street, parked and locked. Third, because petitioner had not committed a traffic offense for which impoundment is authorized, the vehicle could not have been impounded as part of the police function of enforcing traffic regulations.

However, even if impoundment had been authorized, it is doubtful that the police could have conducted a routine inventory search without asking petitioner if he wanted one done. The purpose of an inventory search is to protect the police from lawsuits arising from mishandling of personal property of a defendant. Clearly, a defendant may reject this protection, preferring to take the chance that no loss will occur. *See generally United States v. Lyons,* 706 F.2d 321, 335 n.23 (D.C. Cir. 1983).

For these reasons and those discussed above, we find that evidence taken from petitioner's vehicle was illegally seized. We therefore reverse.

WILLIAMS, C.J., UTTER and PEARSON, JJ., and CUNNINGHAM, J. Pro Tem., concur.

DIMMICK, J. (dissenting)—The lesson the majority teaches today is that detaining a burglar leaving the scene

of the burglary in progress is unconstitutional. And even as it prohibits the police action taken to investigate this burglary, the majority says little to indicate exactly what it finds offensive to the Fourth Amendment or to our state constitution in this case. As a result, those who have the duty to protect society and enforce our laws are offered no constructive suggestions to guide future encounters between police and suspect under like circumstances. Since I cannot agree that constitutional principles deny the police the opportunity to pursue investigation of the only person apprehended near the crime site within minutes of the silent alarm report, I dissent.

It is firmly established that a police officer lacking probable cause to arrest is not required to ignore suspicious circumstances and allow a suspect to pursue criminal activity unimpeded. *Terry v. Ohio,* 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968); *State v. White,* 97 Wn.2d 92, 640 P.2d 1061 (1982). A reasonable "seizure" of the suspected person is constitutionally permitted to maintain the status quo momentarily and allow the officer to resolve the matter, one way or the other, by obtaining more information. *See Adams v. Williams,* 407 U.S. 143, 146, 32 L. Ed. 2d 612, 92 S. Ct. 1921 (1972).

Just as firmly established is the requirement that such seizures of the suspected person be based on specific, articulable facts which warrant a reasonable belief that criminal activity is under way. *Terry.* Without an articulable, objective basis for the detention, police discretion to stop would be unfettered. At the very least, the Fourth Amendment was intended to prevent such arbitrary, potentially harassing, investigative tactics. *See State v. Hobart,* 94 Wn.2d 437, 443, 617 P.2d 429 (1980).

To assess whether criminal activity was objectively manifested so as to justify an investigative detention, the totality of the circumstances confronting the officer must be taken into account. This includes information given the officer, observations the officer makes, and inferences and deductions drawn from his or her training and experience.

*United States v. Cortez,* 449 U.S. 411, 66 L. Ed. 2d 621, 101 S. Ct. 690 (1981). The officer need not be convinced to a certainty, but merely find criminal activity a probability, using commonsense conclusions about human behavior. *Cortez.*

The majority finds objectionable the manner of making the stop and its length. I think that the majority has not appropriately assessed the reasonableness of the officer's actions "under the circumstances taking into consideration the seriousness of the offense suspected, the consequences of delay on the part of officers, the likelihood of the detainee's involvement in the offense, and the extent of the intrusion." *White,* at 106.

Our test, in *White,* is based on a reasonableness test articulated by the United States Supreme Court in *Terry.* The *Terry* Court balanced the governmental interest in the seizure against the invasion the seizure entails to the constitutionally protected interest of the private citizen. *Terry,* 392 U.S. at 21. On occasion, a more than momentary detention or a rather intrusive search has been upheld by the Court as reasonable under the circumstances and in view of the governmental interests at stake. *Michigan v. Long,* __ U.S. __, 77 L. Ed. 2d 1201, 103 S. Ct. 3469 (1983); *Michigan v. Summers,* 452 U.S. 692, 69 L. Ed. 2d 340, 101 S. Ct. 2587 (1981). In these cases, the detention was collateral to the investigation being undertaken. The seizure merely enabled the officers to "freeze" the situation until further investigation resolved the matter with respect to the detained person.

To be distinguished are those situations in which the detention itself was the investigative tool. *E.g., Dunaway v. New York,* 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248 (1979); *Davis v. Mississippi,* 394 U.S. 721, 22 L. Ed. 2d 676, 89 S. Ct. 1394 (1969). As the *Summers* Court recognized, when the detention becomes a method to procure self-incriminating interrogation in a custodial setting, the detention is no longer justified as a means of merely preserving the status quo. *Summers,* 452 U.S. at 701–02.

In my opinion, the police officers were justified in freezing the situation they encountered in this case for an initial 5–minute period. During this 5 minutes, the officers diligently pursued a means of investigation, consistent with ensuring their safety, that would resolve whether the suspected burglary in fact had occurred. When the silent alarm was corroborated by the unlocked front door, petitioner was immediately provided an opportunity to identify himself and be cleared of any involvement in the burglary. His answers were inconsistent and evasive enough to provide further objective reasons to continue his detention for another 15 minutes until the house had been investigated and secured, and the officers had determined whether there were accomplices or whether victims were present in the home. While continued detention was clearly a great intrusion, society's interest in efficient crime detection and prevention of injury to innocent victims warranted this detention.

The majority also suggests that at no time during the detention did the officers have probable cause to arrest petitioner, hinting that until petitioner's presence in the house was established, there was not probable cause to arrest him. I disagree.

Probable cause must be determined from the totality of facts and circumstances within the knowledge of the arresting officer, taking into consideration that officer's special experience and expertise. *State v. Fricks,* 91 Wn.2d 391, 588 P.2d 1328 (1979). It is applied in light of everyday experiences, considering the time, the place, and the pertinent circumstances. There must be a reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in believing the accused to be guilty. *State v. Scott,* 93 Wn.2d 7, 604 P.2d 943, *cert. denied,* 446 U.S. 920 (1980).

The officers concluded a thorough search of the burglarized residence, finding ransacked rooms, a television sitting outside in the rain, and no other suspects. The arrest of petitioner was reasonable in light of these circumstances. It

is only the probability of criminal activity and not a prima facie showing of it which governs the standard of probable cause. *State v. Seagull,* 95 Wn.2d 898, 632 P.2d 44 (1981). It seems to me that the officers would have been neglecting their duty had they allowed petitioner to go free under these circumstances. *See State v. Taplin,* 67 Wn.2d 610, 409 P.2d 169 (1965); *State v. Young,* 28 Wn. App. 412, 624 P.2d 725 (1981).

I also disagree with the majority that the impoundment of the car being driven by petitioner was unlawful. This court has recognized that if an officer has probable cause to believe that a vehicle is used in the commission of a felony it may be impounded. *State v. Houser,* 95 Wn.2d 143, 149, 622 P.2d 1218 (1980). Transporting stolen goods from a burglary site must surely qualify as "used in the commission of a felony." *See State v. Glasper,* 84 Wn.2d 17, 22, 523 P.2d 937 (1974). After the officers had determined that the house had been burglarized, with strong indication that some missing items had been placed outside, it was reasonable to conclude that the stolen items were to be taken away in the vehicle.

Moreover, petitioner had stated that the vehicle belonged to a third person. Since it was likely, under all the circumstances, that the vehicle contained stolen property, the prudent course was to impound the vehicle, thus preventing destruction of evidence, until the owner could be contacted and a search warrant obtained.

I also cannot agree with the majority's assertion that this routine inventory search made pursuant to standard police procedures would have been permissible only if petitioner had consented. Petitioner had no interest in determining, on behalf of the registered owner, what steps should be taken to best protect the owner's property. Furthermore, the purpose of an inventory search is not merely to protect the owner from suffering loss during the period of detention. An inventory also alerts the officers to any potential danger to themselves or the public from items the car may contain. *South Dakota v. Opperman,* 428 U.S. 364, 49 L.

Ed. 2d 1000, 96 S. Ct. 3092 (1976). Even if the officers have probable cause to believe the car contains stolen property, they should not be precluded from determining prior to impoundment whether the vehicle may be safely moved away. *See United States v. Laing,* 708 F.2d 1568 (11th Cir. 1983); *State v. Glenn,* 649 S.W.2d 584 (Tenn. 1983).

The inventory search in this case took place after petitioner was transported to police headquarters. Nothing in the record indicates that the inventory was a pretext to conduct a full search for evidence. The officer in charge of the inventory testified that he conducted a routine inventory search, during which he noticed a jewelry box protruding from under the driver's seat. In my view, the officer was obligated to determine whether the box's contents were innocuous or valuable before returning it to its place. Following completion of the inventory, the vehicle was sealed and transported to the impoundment yard. A full evidentiary search was later conducted by department detectives pursuant to a search warrant. Prior to this search, the vehicle's registered owner had given consent to the search.

The majority ignores another issue that merits discussion. Would the jewelry box found in the vehicle have been "inevitably discovered" in any case, when the officer entered the car to verify the registered owner's name or when the search, pursuant to the owner's consent and a search warrant, was conducted? If so, admission of the jewelry box at trial was not error. *See Nix v. Williams,* ___ U.S. ___, 81 L. Ed. 2d 377, 104 S. Ct. 2501 (1984).

The circumstances of this case justified the investigation the police officers conducted. I would affirm the courts below. Therefore, I dissent.

BRACHTENBACH, DOLLIVER, and DORE, JJ., concur with DIMMICK, J.

Reconsideration denied November 20, 1984.