FILED
**APRIL 30, 2015**
In the Office of the Clerk of Court
WA State Court of Appeals, Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 31587-8-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | PUBLISHED OPINION |
| | ) | |
| A.A.,[1] | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, J. — Warrantless searches of constitutionally protected areas are presumptively unreasonable absent proof by the State that one of the well-established exceptions apply. In this case, a police officer detained A.A., a runaway juvenile, under the Family Reconciliation Act, chapter 13.32A RCW, and then conducted a pat-down search before placing him in his patrol car. The officer did not feel anything resembling a weapon, but searched inside A.A.'s pants pockets and found methamphetamine and marijuana. On appeal, A.A. argues that the trial court erred in denying his CrR 3.6 suppression motion because the State failed to establish that the search fell under any

---

[1] For purposes of this opinion, we shall use initials for the appellant's name.

exception to the warrant requirement.  We agree, and reverse.

## FACTS

On the morning of February 25, 2013, A.A.'s mother called Yakima police to report that her 15-year-old son, A.A., had run away from home.  She told the responding police officer, Cesar Escamilla, that she believed A.A.'s probation officer would issue a warrant for A.A.'s arrest, and asked the officer to transport A.A. to a Crisis Residential Center (CRC), a secure facility for juveniles, if police found him.  Later that day, Officer Escamilla found A.A. walking down an alley a few blocks north of his mother's house.  The officer stopped and detained A.A., intending to take him to the CRC.  Aware that the CRC had a policy of searching all youth before admitting them to the facility,[2] Officer Escamilla searched A.A. near his patrol car.  During the search, the officer found methamphetamine in a coin pocket of A.A.'s pants and marijuana in another pocket.  The officer then transported A.A. to a juvenile detention center, rather than the CRC.  The State charged A.A. with two counts of unlawful possession of a controlled substance.

A.A. moved to suppress the evidence as the product of an unlawful search.  At the CrR 3.6 hearing, Officer Escamilla testified that A.A. was "[j]ust walking down an alley"

---

[2] A sign posted at the CRC provides: "All youth entering the [CRC] must be thoroughly searched and patted down in front of the OHANA staff by Law Enforcement." Clerk's Papers (CP) at 35.  The officer did not follow this policy because the search

2

and appeared "upset," but that he was not engaged in criminal activity and did not appear dangerous to himself or others. Report of Proceedings (RP) at 12-13. He testified that the Yakima police department policy requires police to search a passenger for weapons prior to transport in a patrol car, but admitted that his search of A.A. was more intrusive because the CRC does not allow narcotics. He explained: "I'm searching for any objects, any items that—youth may have either in his pockets, hidden, anything besides clothing." RP at 9. Officer Escamilla admitted that he did not feel anything resembling a weapon during the pat-down search and that no CRC staff member was present.

A.A. argued that the officer could lawfully conduct a pat-down search for weapons prior to transporting A.A. to the CRC, but that the search into his pockets exceeded the scope of a reasonable pat down for weapons. He argued, "just because the CRC has a policy regarding searches does not mean that that trumps the—my client's constitutional rights. [I]f they want to do whatever they need to do to keep their facility safe, they can do that. However, to require law enforcement to do that is clearly unconstitutional because that does not fit an exception of the—the requirement to have a warrant before searching my client's person." RP at 23. The State countered that "a second search would happen anyway" and that "[t]he justification for the search was in existence at the

occurred before reaching the CRC and was not performed in front of OHANA staff.

time respondent was taken into custody. He was going someplace secure; he needed to be searched." RP at 28, 26.

The trial court denied A.A.'s motion to suppress. Its written conclusions of law provided in part, (1) a civil commitment search is not limited to patting the detained person for weapons, (2) the pat-down search was authorized under *Terry*,[3] (3) a civil commitment search has the purpose of protecting both the police officer and the affected individual, (4) it was reasonable to search A.A. knowing he was going to be transported to the CRC where drugs and weapons are contraband and not allowed, and (5) the search was conducted as a result of a civil detention, not as a search incident to arrest. The court ultimately concluded that "it was reasonable to conduct the search, either at the time [A.A.] was taken into custody or at the time of admission at the CRC." Clerk's Papers at 55.

In a stipulated facts bench trial, the trial court found A.A. guilty as charged. A.A. appeals the denial of his suppression motion.

## ANALYSIS

The sole issue on appeal is whether the trial court erred when it concluded Officer Escamilla's search of A.A. was reasonable under the Family Reconciliation Act (the Act),

---

[3] *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

chapter 13.32A RCW, because A.A. was going to be transported to the CRC, a secure facility for juveniles, which requires a search of juveniles before admission. This question appears to be one of first impression in this state and requires us to evaluate what search and seizure standards apply to a civil protective custody detainee under the Act.

A.A. does not dispute that Officer Escamilla had the authority to detain him under the Act or that the officer had the authority to conduct a pat-down search for weapons; rather, he argues that the State failed to establish that the search of his pockets fell under any of the prescribed exceptions to the search warrant requirement. A.A. focuses his argument on the emergency exception, maintaining that it does not apply because A.A. was not a danger to himself or others. He contends it is improper to "extend[] the emergency situation exception to the warrant requirement to searches of juveniles following civil detention pursuant to RCW 13.32A.050." Br. of Appellant at 10.

The State counters that the search was impliedly authorized under the Act because the purpose of the statute is to protect children who present a danger to themselves. It contends that the "timing of the search is of no consequence" because "[A.A.] was going to go to the crisis residential center which requires this officer to search [A.A.] before he would be allowed to enter." Br. of Resp't at 7. The State analogizes the search to a

5

search incident to arrest that "'can occur prior to the arrest, so long as a sufficient basis for the arrest existed before the search commenced.'" Br. of Resp't at 9 (quoting *State v. Chavez*, 138 Wn. App. 29, 33, 156 P.3d 246 (2007)).

*Standard of Review*

We review a trial court's decision on a motion to suppress for substantial evidence. *State v. Schultz*, 170 Wn.2d 746, 753, 248 P.3d 484 (2011). We review conclusions of law de novo. *Id.* Evidence seized during an illegal search must be suppressed under the exclusionary rule. *State v. Gaines*, 154 Wn.2d 711, 716-17, 116 P.3d 993 (2005).

*Fourth Amendment to the United States Constitution*

The Fourth Amendment to the United States Constitution and article I, section 7 of the Washington Constitution prohibit unreasonable searches and seizures. *State v. Williams*, 102 Wn.2d 733, 736, 689 P.2d 1065 (1984). Under these provisions, warrantless searches are "per se" unreasonable. *State v. Walker*, 136 Wn.2d 678, 682, 965 P.2d 1079 (1998). However, a search incident to a lawful arrest is a recognized exception to the warrant requirement. *State v. Boursaw*, 94 Wn. App. 629, 632, 976 P.2d 130 (1999) (quoting *State v. Smith*, 119 Wn.2d 675, 678, 835 P.2d 1025 (1992)). The exception allows an officer to search an arrestee for weapons as a measure to protect the officer or to search for evidence that may be destroyed. *State v. McKenna*, 91 Wn. App.

554, 560-61, 958 P.2d 1017 (1998). The community caretaking function, which allows

for limited searches when it is necessary for police officers to render emergency aid or

assistance, is also a recognized exception to the warrant requirement. *State v. Thompson*,

151 Wn.2d 793, 802, 92 P.3d 228 (2004). These are "divorced" from a criminal

investigation. *Id.* The State bears the burden of establishing an exception to the warrant

requirement. *Schultz*, 170 Wn.2d at 754.

*Civil Protective Custody Situation*

Washington's Family Reconciliation Act authorizes a police officer to take a

juvenile into civil custody "[i]f a law enforcement agency has been contacted by the

parent of the child that the child is absent from parental custody without consent."

RCW 13.32A.050(1)(a). The Family Reconciliation Act "clearly is designed to promote

the public interest in the safety of children." *State v. Kinzy*, 141 Wn.2d 373, 389, 5 P.3d

668 (2000). Under the Act, "[l]aw enforcement custody shall not extend beyond the

amount of time reasonably necessary to transport the child to a destination authorized by

law and to place the child at that destination." RCW 13.32A.050(2)(a). The statute does

not contain provisions specifying how, when, or to what extent searches may be

conducted.

Relying primarily on *State v. Dempsey*, 88 Wn. App. 918, 947 P.2d 265 (1997), the State argues that the search was justified under the "community caretaking" exception to the warrant requirement. In *Dempsey*, a police officer detained the defendant after receiving a call that he had threatened his parents and they feared for their safety. *Id.* at 920. Police observed that the defendant was paranoid, volatile, and physically aggressive. He had to be restrained from assaulting his father. Before transporting the defendant to Sacred Heart Medical Center for an involuntary civil commitment for a mental health evaluation under chapter 71.05 RCW, police conducted a pat-down search for weapons and felt a large knife in his pants pocket. A police officer reached into the pocket to remove the knife and recognized a large bindle that contained methamphetamine. *Id.* at 921.

The defendant challenged the search, arguing that his civil detention was pretextual because officers knew he had recently used drugs. We initially noted that the officers properly detained Mr. Dempsey under chapter 71.05 RCW because it was reasonable to believe that "Mr. Dempsey was a substantial and imminent threat to himself and others." *Id.* at 923-24. We stated that "[a] search incident to a civil detention is not limited by *Terry* considerations" because the only purpose of a *Terry* search is officer safety, whereas, a civil custody search has

the "primary purpose of protecting, not the officer, but the affected individual and others who may come into contact with him while rendering aid." *Id.* at 924 (footnote omitted). Thus, in view of Mr. Dempsey's acutely paranoid state, this court held that a search incident to a civil commitment detention is not limited to a weapons pat down because the arresting officer has a duty "to identify and remove anything with which [a defendant] might harm himself or others, including street drugs." *Id.* at 924. This court concluded:

> The search here falls into the "emergency situation" exception to the warrant requirement. This exception permits a warrantless search to whatever extent is objectively reasonable to carry out the police caretaking function, given the circumstances reasonably perceived by the officer at the scene at the time. During an intervention, the officer may search for any dangerous instrumentality. There need be only "some reasonable basis to associate the emergency with the place to be searched."

*Id.* at 924 (citations omitted) (quoting *State v. Lynd*, 54 Wn. App. 18, 21, 771 P.2d 770 (1989)).

This case is distinguishable from *Dempsey*. First, Washington's involuntary treatment act (ITA), chapter 71.05 RCW, and the Family Reconciliation Act, chapter 13.32A RCW, serve different purposes and, therefore, lend themselves to different search standards. The purpose of the ITA is to protect persons who present an imminent risk of harm to themselves or others. RCW 71.05.153(1). Thus, the purpose of a search

9

impliedly authorized under the statute is the protection of the unstable individual, police officers, or others from imminent harm. By its very language, the statute encompasses the emergency exception, and therefore police are generally not limited to a protective pat-down search for weapons under *Terry*, which is focused on the protection of the officer. *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). Chapter 13.32A RCW—the Family Reconciliation Act—in contrast, is designed to protect runaway children, and thus implicates different search standards, which will be discussed below.

Here, in contrast to *Dempsey*, the detainee did not pose an imminent threat of harm to himself or others. Officer Escamilla testified that A.A. was simply walking down the street and did not appear dangerous. In fact, the officer admitted that the search was conducted for the purpose of finding weapons or street drugs because CRC prohibited contraband at its facility. Thus, unlike *Dempsey*, the initial pat-down for weapons was sufficient to protect the officer.

*Kinzy* is helpful to our analysis. In that case, at around 10:00 p.m. on a school night, police officers saw a young female who appeared to them to be between 11 and 13 years old. *Kinzy*, 141 Wn.2d at 378. She was standing on a public sidewalk in a high narcotics area with several others, including an older

10

person police believed to be associated with narcotics. *Id.* at 378-79. Officers decided to approach her. As they did so, Ms. Kinzy put her head down and started to walk away. One officer grabbed her by the arm to keep her from leaving. *Id.* at 380. Police patted her down for weapons and saw flecks of cocaine on her coat. Ms. Kinzy then admitted that she had more cocaine in her bra.

At the suppression hearing, a police officer testified that he stopped Ms. Kinzy out of concern for her safety, not suspicion of criminal activity. Division One of this court concluded that the initial seizure of Ms. Kinzy was valid under the community caretaking function, the protective frisk was valid under *Terry* and the plain view observation, and "seizure" of the cocaine flecks was valid under the plain view exception. *Id.* at 381-82.

Our Supreme Court reversed, noting that the community caretaking function involves a situation of lesser urgency and searches resulting in less intrusion than the emergency exception. *Id.* at 386. The court noted that "a person may encounter police officers in situations involving not only emergency aid, but also involving a routine check on health and safety." *Id.* at 387. It stated that once the exception applies, "police officers may conduct a noncriminal investigation so long as it is necessary and *strictly relevant to performance of the community caretaking function.* The noncriminal

investigation must end when reasons for initiating an encounter are fully dispelled."

*Id.* at 388 (footnote omitted) (emphasis added).

Applying these principles to the facts of that case, the court held that the initial preseizure encounter was reasonable under the community caretaking function exception, but that police should have allowed Ms. Kinzy to walk away because their interest in maintaining the safety of children did not outweigh Ms. Kinzy's privacy interest in freedom from police intrusion. *Id.* at 392. The court held that once a person is seized under the community caretaking function, "[b]alancing the interests will not necessarily favor action by police." *Id.* at 394. The court concluded, "[w]hen in doubt, the balance should be struck on the side of privacy because the policy of the Fourth Amendment is to minimize governmental intrusion into the lives of citizens. The community caretaking function exception should be cautiously applied because of its potential for abuse." *Id.* at 394-95.

Cases from other jurisdictions discuss search standards in the context of civil protective detentions. In *R.A.S. v. Florida*, 141 So. 3d 687 (Fla. Dist. Ct. App. 2014), police detained R.A.S., a juvenile, because he had been reported absent from school. *Id.* at 689. When the police officer found R.A.S., he offered R.A.S. a ride to school, which R.A.S. accepted. The police officer then asked R.A.S. to empty his pockets before

entering the patrol car. *Id.* R.A.S. emptied all but one pocket. The officer asked if he could "'do a weapons patdown'" and R.A.S. agreed. *Id.* While patting a back pocket, the officer felt a small "'squishy bulge.'" *Id.* He asked what the packet contained, and R.A.S. removed a baggy containing marijuana. *Id.*

The court held that the search was illegal, stating "an officer may conduct a pat-down for weapons before placing a truant in his vehicle, but he is not authorized to conduct a full search." *Id.* The court noted that the detention of a truant was authorized under Florida law, but emphasized that "truancy is not a crime, and a custodial detention for this purpose is not an arrest." *Id.* Because this was not a search incident to arrest, the court held that the officer, at most, was authorized to conduct a pat-down search for weapons before placing R.A.S. in his patrol car. *Id.* The court also held that once the officer performed the pat-down search and determined that R.A.S. was not carrying a weapon or contraband, the officer had no legal basis to continue the search. The court reasoned:

> [W]hen taking a truant into custody, the only concern is for officer safety—
> no crime has been committed and, accordingly, there is no need to preserve
> evidence of a crime. The deputy here knew that the "squishy object" in
> R.A.S.'s pocket was not a weapon. Therefore, he had no legal basis for
> questioning R.A.S. further about the contents of the pocket.

*Id.* at 690.

The Supreme Court of Colorado discussed search standards in the context of detention under its Alcoholism and Intoxication Treatment Act, a civil statute that allows law enforcement to take a person incapacitated by alcohol into protective custody if that person is "'clearly dangerous to the health and safety of himself or others.'" *People v. Dandrea*, 736 P.2d 1211, 1214 (Colo. 1987) (quoting COLO. REV. STAT. 25-1-310(1)). In that case, police searched the pocket of the defendant prior to transporting him to an alcohol detoxification facility under the act. *Id.* at 1212. Police were unable to determine if the defendant possessed a weapon due to the thickness of his jacket and, therefore, began removing the contents of his pockets. *Id.* at 1213. During the search, police found a packet of heavy folded paper the size of a razor blade. *Id.* Officers opened the packet and found cocaine. At the suppression hearing, the trial court ruled that the act, a civil statute, only empowered police officers to conduct a pat-down search of the person taken into civil custody, and that police should have quarantined the packet without any further search of its contents. *Id.* The State appealed, arguing that the act should be construed to authorize police officers to conduct as complete a search as would be permitted if the individual was arrested on probable cause that the person committed a criminal act.

The Colorado Supreme Court rejected the State's argument, finding the intent of the act was to prevent harm to the detainee resulting from the detainee's intoxication, and,

14

therefore, the act could not be used to justify an arrest comparable to a criminal arrest. *Id.* at 1215. The court analyzed the search under constitutional principles, stating "[t]he constitutional test of a warrantless search . . . is reduced to the question of whether the search was reasonable under all the relevant attendant circumstances." *Id.* at 1216. The court then noted that the primary justification for warrantless searches incident to custodial arrests is the preservation of evidence and the protection of arresting officers. Noting that only the latter is at issue in civil protective custody cases, the court stated, "[w]hile the goal of assuring officer safety is admittedly important, the legislative emphasis on the noncriminal nature of the contact between government officials and private citizens in civil protective custody settings requires that in such settings the individual's privacy interest must be accorded maximum weight in determining the reasonableness of police conduct." *Id.* at 1217. The court suggested a "case-by-case" evaluation, rather than a rigid formula due to the different degrees of potential danger in any given civil protective custody detention. *Id.* The court ultimately held:

> It would appear, therefore, that in most cases involving detention of a private citizen for the sole purpose of placing that person in civil protective custody, a pat-down search for weapons at the scene would fully satisfy the need to assure officer safety and the safety of the individual while simultaneously according sufficient weight to the detainee's status as a noncriminal and attendant interest in personal privacy. Thus the discovery of an item believed to be or to contain a weapon would in most circumstances require nothing more than the isolation of that item at the

15

scene of the detention. Once the detainee's access to the item is denied, any further search of the item would have to be justified on some other basis.

*Id.* at 1218.

In view of the principles enunciated above, we believe that a case-by-case approach as set forth in *Dandrea* best balances the constitutional rights of the detainee with safety considerations of third persons. Generally, in cases involving civil detentions under the act, only a protective pat-down search for weapons is appropriate. However, when police are faced with emergency situations in which the detainee poses a threat to himself or others, a more intrusive search is justified. *Dempsey*, 88 Wn. App. at 924-25. Thus, if A.A. had exhibited signs of acute mental instability and presented a risk of imminent or substantial harm to himself or others, the search of his pockets would have been justified.

Under the act, a law enforcement officer is unquestionably fulfilling his or her role as a community caretaker when he or she encounters a child runaway or a child beyond the control of his parents. Under the act, the police have an obligation to transport the child to the appropriate secure facility. This implies authority to conduct an initial pat-down search for weapons before placing the child in the patrol car. However, we must be cautious in applying the community caretaking function exception and satisfy ourselves that the claimed function was not a pretext for an evidentiary search. Thus, in the context

of a warrantless search stemming from noncriminal conduct, the search must be limited in scope by the circumstances of the particular encounter and "strictly" relevant to the community caretaking function. *Kinzy*, 141 Wn.2d at 388.

Here, the particular circumstances did not justify the search of A.A.'s pockets. Once the officer conducted the pat-down search and determined that A.A. did not have a weapon, the search should have stopped. A.A. had not committed a crime and, therefore, there was no need to preserve evidence of a crime. A.A. did not exhibit signs of dangerousness to himself or others. The only concern was for officer safety.

The State's argument that the search was justified because the CRC requires a search of juveniles before admission is not persuasive nor is it relevant. Notably, the officer did not perform this search at the CRC according to CRC policy. We express no view regarding potential search issues at the CRC facility performed according to CRC policy. Under our facts, this was a noncriminal protective custody situation, which requires us to accord maximum weight to A.A.'s privacy interest in evaluating the reasonableness of the search. Unless the State can establish that the search fell under an exception to the warrant requirement, we must reverse. The State has failed to establish an exception.

17

No. 31587-8-III
*State v. A.A.*

    Reversed.

_____
Lawrence-Berrey, J.

WE CONCUR:

_____
Siddoway, C.J.

_____
Brown, J.

18