IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 33598-4-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| BRYAN D. BEWICK, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, A.C.J. — Bryan Bewick appeals his conviction on two

counts of possession of a controlled substance. He argues the trial court erred in denying

his motion to suppress. He also argues the trial court erred in assessing mandatory legal

financial obligations (LFOs) against him. Finding no error, we affirm.

FACTS

The State charged Mr. Bewick with two counts of possession of a controlled

substance. Prior to trial, Mr. Bewick filed a motion to suppress. The motion appended

written summaries of officer testimonies produced by the State in discovery. The parties

indicated there were no questions of fact. Based on the written summaries, the trial court

made the following findings of fact that are not contested on appeal:

On February 19, 2015, the United States Marshal's Violent Offender's Task Force was searching for a wanted person in the area of 12114 E. Cataldo Avenue in Spokane County. The subject being sought was a white male known as Brent Graham, known to be staying in apartment 17 at the above address.

The officers observed the defendant coming down a stairway from the general area of apartment 17. The defendant was wearing sunglasses and a hoodie covering his head. The officers could not discern the defendant's features beyond his physical stature and ethnicity.

The officers, who were wearing protective body armor with the word "POLICE" on the front, approached the defendant who was now getting into a vehicle with a white female. Upon seeing the officers, the defendant began running from the scene. The defendant was stopped after a short foot pursuit and identified as Bryan D. Bewick with a date of birth of May 7, 1986.

Mr. Bewick began accessing or attempting to access his left front pocket, which the officers determined, based on their training and experience, was furtive and appeared to be an attempt to discard or conceal contraband. When questioned about the behavior, Mr. Bewick admitted he had illicit drugs in his pocket. The officers then retrieved a baggie containing a white crystalline substance that had the appearance of

2

methamphetamine, and a vial containing what appeared to be black tar heroin. A field test confirmed the substances to be methamphetamine and heroin. A status check then revealed that Mr. Bewick was wanted on a warrant issued by the Washington State Department of Corrections. Mr. Bewick was arrested because of the warrant and his possession of illegal drugs.

From the above findings of fact, the trial court concluded the officers acted lawfully in determining if Mr. Bewick was the person they were looking for, and that Mr. Bewick's immediate flight was an additional circumstance that justified the seizure and detention to determine his identity. The trial court also concluded that Mr. Bewick's furtive behavior justified further investigation and checking for warrants once his identity was discovered. The trial court ultimately concluded that the officers' observations and reasonable conclusions rendered the stop and subsequent discovery of the contraband lawful.

Following a stipulated facts trial, the trial court found Mr. Bewick guilty of both counts of possession of a controlled substance. At sentencing, the trial court imposed LFOs in the form of a $500 victim assessment, a $200 criminal filing fee, and a $100 DNA[1] fee. Mr. Bewick timely appealed.

---

[1] Deoxyribonucleic acid.

3

No. 33598-4-III
*State v. Bewick*

ANALYSIS

A.   INITIAL DETENTION

Mr. Bewick first argues law enforcement did not have a reasonable, articulable suspicion to initially detain him. Because Mr. Bewick does not challenge any of the trial court's findings of fact, we review de novo whether the trial court derived proper conclusions of law from those findings. *State v. Armenta*, 134 Wn.2d 1, 9, 948 P.2d 1280 (1997).

Warrantless seizures are generally presumed to be unconstitutional. *State v. Gatewood*, 163 Wn.2d 534, 539, 182 P.3d 426 (2008); *State v. Ladson*, 138 Wn.2d 343, 349, 979 P.2d 833 (1999); *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971). The rule against warrantless seizures is subject to a few "jealously and carefully drawn exceptions." *Gatewood*, 163 Wn.2d at 539; *Coolidge*, 403 U.S. at 455. The burden is on the State to prove that an exception to the warrant requirement applies. *State v. Hendrickson*, 129 Wn.2d 61, 71, 917 P.2d 563 (1996); *State v. Houser*, 95 Wn.2d 143, 149, 622 P.2d 1218 (1980).

One such exception is a *Terry*[2] stop. *Ladson*, 138 Wn.2d at 349. A *Terry* stop permits an officer to briefly detain and question a person reasonably suspected of criminal

---

[2] *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

4

activity. *State v. Smith*, 102 Wn.2d 449, 452, 688 P.2d 146 (1984). A *Terry* stop is evaluated using a two-part inquiry, "'First, was the initial interference with the suspect's freedom of movement justified at its inception? Second, was it reasonably related *in scope* to the circumstances which justified the interference in the first place?'" *State v. Sweet*, 44 Wn. App. 226, 229, 721 P.2d 560 (1986) (quoting *State v. Williams*, 102 Wn.2d 733, 739, 689 P.2d 1065 (1984)).

For the stop to be valid, the officer must have "'a reasonable, articulable suspicion, based on specific, objective facts, that the person seized has committed or is about to commit a *crime*.'" *Gatewood*, 163 Wn.2d at 539 (quoting *State v. Duncan*, 146 Wn.2d 166, 172, 43 P.3d 513 (2002) (citing *Terry*, 392 U.S. at 21). The suspicion of criminality must be focused specifically on the individual seized, and not on the area in which the individual is found. *Smith*, 102 Wn.2d at 452-53; *Ybarra v. Illinois*, 444 U.S. 85, 90-91, 100 S. Ct. 338, 62 L. Ed. 2d 238 (1979). When reviewing a *Terry* stop, a court must examine the totality of the circumstances presented to the investigating officers. *State v. Glover*, 116 Wn.2d 509, 514, 806 P.2d 760 (1991).

Here, the officers were searching for a wanted person, Mr. Graham, in the vicinity of 12114 East Cataldo Avenue in Spokane Valley. The officers knew Mr. Graham was staying in apartment 17. The only description the officers had of Mr. Graham was that he

5

was a white male of medium build. While surveilling the apartment, the officers observed Mr. Bewick coming down the stairs from the general area of apartment 17. Mr. Bewick was wearing a hoodie, with the hood up, and sunglasses. The officers could only discern that he was a white man of medium build, which matched Mr. Graham's physical characteristics. At that point, the officers decided to make contact with Mr. Bewick to determine if he was in fact Mr. Graham. The officers, wearing tactical vests with the word "POLICE" on them, approached Mr. Bewick to speak with him. When Mr. Bewick saw the officers approaching, he immediately fled. After Mr. Bewick began to flee, one of the officers shouted a verbal command for him to stop.

Mr. Bewick asserts he was seized when the officers approached him wearing tactical vests. However, at that point the officers were doing nothing more than trying to contact Mr. Bewick to identify him. Law enforcement officers are permitted to approach a citizen and ask for identification as part of a casual conversation. *State v. Bailey*, 154 Wn. App. 295, 300, 224 P.3d 852 (2010). Mr. Bewick fled before any conversation could be initiated. At that point, he was ordered to stop. Mr. Bewick was seized when one of the officers ordered him to stop. *See Sweet*, 44 Wn. App. at 230; *State v. Friederick*, 34 Wn. App. 537, 541, 663 P.2d 122 (1983).

Mr. Bewick's seizure was based on the following facts known to the officers:

6

(1) the officers were searching for a wanted person, Mr. Graham, in the vicinity of 12114 East Cataldo Avenue in Spokane Valley, (2) the officers knew Mr. Graham was staying in apartment 17, (3) Mr. Graham was a white man of medium build, (4) the officers saw Mr. Bewick coming down the stairs from the general area of apartment 17, (5) Mr. Bewick was wearing a hoodie, with the hood up, and sunglasses, and the officers could only discern that he was a white man of medium build, and (6) when Mr. Bewick saw the officers approaching him, he immediately fled.

Mr. Bewick argues that none of these facts are sufficient to justify a *Terry* stop. However, when reviewing a *Terry* stop, a court must examine the totality of the circumstances presented to the investigating officers. *Glover*, 116 Wn.2d at 514. It is true that facts such as an individual's presence in a high-crime area, or a vague description of a suspect do not, *on their own*, justify a *Terry* stop. *See, e.g., State v. Doughty*, 170 Wn.2d 57, 62, 239 P.3d 573 (2010); *Smith*, 102 Wn.2d at 454. But the critical fact here is that Mr. Bewick fled as soon as he saw the officers. Mr. Bewick's flight from the officers, in addition to the fact he matched the vague physical description of Mr. Graham and was seen leaving the vicinity of Mr. Graham's apartment, gave the officers "a reasonable, articulable suspicion" that Mr. Bewick was Mr. Graham. *See Gatewood*, 163 Wn.2d at 539. We conclude the officers had a sufficient reasonable,

articulable suspicion to initially detain Mr. Bewick to determine whether he was Mr. Graham.

    B.      Scope and Purpose of Lawful *Terry* Stop

    Mr. Bewick next argues the officers exceeded the scope and purpose of a lawful *Terry* stop when they continued to detain him after they identified him.

    A lawful *Terry* stop is limited in scope and duration to fulfilling the investigative purpose of the stop. *State v. Acrey*, 148 Wn.2d 738, 747, 64 P.3d 594 (2003) (citing *Williams*, 102 Wn.2d at 739-41); *Florida v. Royer*, 460 U.S. 491, 500, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983). "If the results of the initial stop dispel an officer's suspicions, then the officer must end the investigative stop." *Acrey*, 148 Wn.2d at 747. But, if the officer's initial suspicions are confirmed or are further aroused, the scope of the stop may be extended and its duration may be prolonged. *Id.* (citing *Williams*, 102 Wn.2d at 739-40).

    Here, the scope and purpose of the *Terry* stop was to determine if Mr. Bewick was Mr. Graham. The trial court's findings imply that Mr. Bewick was identified prior to making any furtive movements. Nevertheless, Mr. Bewick's initial flight from the officers and refusal to obey an officer's command to stop justified the officers' cautious decision to perform a status check to assure that Mr. Bewick was not Mr. Graham.

8

Although dispatch eventually verified that Mr. Bewick's identification was accurate, this verification did not occur until after Mr. Bewick admitted to having the illegal drugs. We conclude that the officers did not exceed the lawful scope and purpose of the *Terry* stop when they performed a status check to verify that Mr. Bewick was not Mr. Graham.

C.    IMPOSITION OF MANDATORY LFOS

For the first time on appeal, Mr. Bewick argues the trial court erred in imposing LFOs because (1) the court did not inquire into his ability to pay, and (2) the mandatory LFOs imposed on him violate substantive due process and equal protection. Mr. Bewick also argues the State should not be awarded appellate costs if it is the substantially prevailing party here. RAP 14.2.

*a. The* Blazina *ability to pay inquiry*

*State v. Blazina*, 182 Wn.2d 827, 834-35, 344 P.3d 680 (2015) holds that appellate courts have discretion under RAP 2.5(a) whether to review unpreserved claims of LFO errors. We exercise our discretion and decline to review the claimed error here. This is largely because no statutory or decisional authority supports Mr. Bewick's argument, and his argument is contrary to *State v. Lundy*, 176 Wn. App. 96, 102, 308 P.3d 755 (2013) ("[F]or *mandatory* [LFOs], the legislature has divested courts of the discretion to consider a defendant's ability to pay when imposing these obligations.").

### b. *Constitutionality of mandatory LFOs*

In addition to his general objection to the imposition of LFOs, Mr. Bewick argues

that imposition of LFOs without an assessment of ability to pay violates his substantive

due process rights and equal protection. These constitutional arguments fail for the

reasons set forth in *State v. Mathers*, No. 47523-5-II, 2016 WL 2865576 (Wash. Ct. App.

May 10, 2016).[3]

### D.   APPELLATE COSTS

Mr. Bewick asserts his indigency and requests this court to exercise its discretion

and not award the State appellate costs should it prevail on appeal. The State did not

respond or object to this request.

RAP 14.2 states, "A commissioner or clerk of the appellate court will award costs

to the party that substantially prevails on review, unless the appellate court directs

otherwise in its decision terminating review." Mr. Bewick was declared indigent for the

purposes of appeal. His motion to seek review at public expense indicates he does not

have many assets. Because Mr. Bewick is likely still indigent and because the State did

---

[3] Mr. Bewick also asserts the disparate handling of criminal filing fees across Washington counties implicates the fundamental constitutional right to travel. However, he provides no support for his contention nor does he provide much in the way of reasoned legal argument. We therefore decline to consider his argument. *See* RAP 10.3(a)(6); *State v. Johnson*, 119 Wn.2d 167, 171, 829 P.2d 1082 (1992).

No. 33598-4-III
*State v. Bewick*

not respond or object to Mr. Bewick's request, we decline to award appellate costs to the State.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_Lawrence-Berrey, A.C.J._
Lawrence-Berrey, A.C.J.

WE CONCUR:

_Siddoway, J._
Siddoway, J.

_Pennell, J._
Pennell, J.

11